# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 30, 2015 Session[1] Heard at Nashville

## STATE OF TENNESSEE v. CORRIN KATHLEEN REYNOLDS

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 99372      Steven Wayne Sword, Judge**

_____

**No. E2013-02309-SC-R11-CD – Filed November 3, 2016**

_____

We granted this appeal to determine whether the warrantless blood draw violated the defendant's right to be free from unreasonable searches and seizures, guaranteed by the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution, and, if so, whether the exclusionary rule applies and requires suppression of the evidence. We conclude that the warrantless blood draw violated the defendant's federal and state constitutional right to be free from unreasonable searches and seizures. Nevertheless, we adopt the good-faith exception to the exclusionary rule articulated by the United States Supreme Court in <u>Davis v. United States</u>, 564 U.S. 229 (2011), and as a result, hold that any evidence derived from testing the defendant's blood need not be suppressed because the warrantless blood draw was obtained in objectively reasonable good-faith reliance on binding precedent. On this basis, we affirm the judgment of the Court of Criminal Appeals.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and HOLLY KIRBY, JJ., joined. SHARON G. LEE, J., filed a dissenting opinion.

Mark E. Stephens, District Public Defender; Jonathan P. Harwell, Assistant Public Defender; and Jim D. Owen, Assistant Public Defender, for the appellant, Corrin K. Reynolds.

_____

[1] Oral arguments were held on the campus of Cumberland University in Lebanon, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; John H. Bledsoe, Senior Counsel; Deshea Dulany Faughn, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Jamie Carter, Assistant District Attorney General, for the appellee, State of Tennessee.

Jeffrey A. DeVasher, Daniel A. Horwitz, and Richard L. Tennent, Nashville, Tennessee; and Ann C. Short, Knoxville, Tennessee, for the Amicus Curiae, Tennessee Association of Criminal Defense Lawyers.

**OPINION**

**I. Factual Background**

Sometime before 8:43 p.m. on the evening of October 29, 2011, a single-vehicle accident occurred in Knox County.[2] Two occupants of the vehicle were killed in the accident, and two others in the vehicle, the defendant, Corrin K. Reynolds, and Shawn Page, were transported to the University of Tennessee Medical Center ("UT Medical Center") for medical treatment. Deputy Lee Strzelecki, a member of the crash reconstruction team for the Knox County Sheriff's Department, was tasked with interviewing the survivors at UT Medical Center. After speaking with them, Deputy Strzelecki concluded that the defendant was driving the car when it crashed, so he asked medical personnel to obtain a sample of her blood. Believing the defendant had verbally consented to the blood draw, Deputy Strzelecki did not obtain a warrant nor advise the defendant that she could refuse the blood draw, or of the legal consequences under the implied consent law should she refuse. Deputy Strzelecki also did not arrest the defendant at that time. Rather, the defendant remained hospitalized for the ensuing seven days, receiving treatment for an open right radius and ulna fracture, six rib fractures, a lumbar compression fracture, a cervical fracture, a sternum fracture, and a mesenteric hematoma.

On April 17, 2012, about six months after the accident, the Knox County Grand Jury issued a presentment charging the defendant with two counts of vehicular homicide, Tenn. Code Ann. § 39-13-213 (2010), one count of vehicular assault, id. § 39-13-106 (2010), one count of reckless endangerment, id. § 39-13-103 (2010), and four counts of driving under the influence of an intoxicant, id. § 55-10-401 (Supp. 2011). The defendant thereafter filed a motion to suppress any evidence derived from the blood sample obtained from her without a warrant on the night of the accident. As relevant to this appeal, the defendant argued that she neither actually nor impliedly consented to the

---

[2] Facts in this opinion have been gleaned from the record of this interlocutory appeal and from the trial court's orders on the defendant's motions to suppress. The defendant has not been tried, and factual statements in this opinion are not binding on remand and do not relieve the State of its obligation to prove the charged criminal offenses beyond a reasonable doubt at any future trial.

warrantless blood draw. In response, the State argued that the defendant had given actual verbal consent to the blood draw and had impliedly consented to the blood draw pursuant to statute. See id. § 55-10-406(a)(1), (f)(1), (f)(4) (Supp. 2011).[3]

At the hearing on the defendant's first motion to suppress, conducted on April 5, 2013, Deputy Strzelecki testified that, on October 29, 2011, he received a page at home at approximately 9:04 p.m., notifying him of "a single[-]vehicle crash with multiple occupants and . . . possibly two deceased individuals."[4] He was directed to interview the survivors, who had been transferred from the crash site to UT Medical Center for treatment. Deputy Strzelecki arrived at the hospital about thirty minutes after receiving the page. By the time he arrived, Deputy Strzelecki knew the identities of the survivors, and, based upon information received from other officers, he was "fairly certain" that the

---

[3] At the time of the defendant's warrantless blood draw, these statutes provided as follows:

(a)(1) Any person who drives a motor vehicle in this [S]tate is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests. However, no such test or tests may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having reasonable grounds to believe the person was driving while under the influence of alcohol, a drug, any other intoxicant[,] or any combination of alcohol, drugs, or other intoxicants as prohibited by [section] 55-10-401, or was violating the provisions of [section] 39-13-106, [section] 39-13-213(a)(2)[,] or [section] 39-13-218.

. . . .

(f)(1) If a law enforcement officer has probable cause to believe that the driver of a motor vehicle involved in an accident resulting in the injury or death of another has committed a violation of [section] 55-10-401, [section] 39-13-213(a)(2)[,] or [section] 39-13-218, the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood. The test shall be performed in accordance with the procedure set forth in this section and shall be performed regardless of whether the driver does or does not consent to the test[.]

. . . .

[(f)](4) The results of a test performed in accordance with subdivision (f)(1), (f)(2)[,] and (f)(3) may be offered as evidence by either the [S]tate or the driver of the vehicle in any court or administrative hearing relating to the accident or offense subject to the Tennessee Rules of Evidence.

Tenn. Code Ann. § 55-10-406(a)(1), (f)(1), (f)(4) (Supp. 2011).

[4] The State attached copies of dispatch records indicating the time Officer Strzelecki received the page to a pleading it filed.

defendant was driving the vehicle when it crashed. Deputy Strzelecki "proceeded to make contact with both of them and decide if [he] needed to get blood draws." Because the accident resulted in two fatalities, Deputy Strzelecki stated that the blood draws "would have been mandatory under our investigation."

He spoke first with Mr. Page, who confirmed that he was a passenger and that the defendant was driving the vehicle. Deputy Strzelecki then located and spoke with the defendant. She was lying on a gurney in the emergency room, waiting to be transported to or from the x-ray department, "and she was alert and conscious and was talking to" him. Although they had only a "brief discussion because there was a lot of commotion with the ER, [the defendant] stated that she had been driving and that everybody in the car had been drinking." Deputy Strzelecki also smelled alcohol during his interaction with the defendant, and he administered the horizontal gaze nystagmus ("HGN") test.[5] The trial court allowed Deputy Strzelecki to testify as an expert about the defendant's performance on the HGN test.[6] Deputy Strzelecki stated that the defendant exhibited all six clues for a "distinct and sustained nystagmus at maximum deviation," caused by intoxication from alcohol or "[a]ny kind of a depressant, like a muscle relaxer or some kind of medication that has some depressant—a central nervous system depressant in it."[7]

_____

[5] The horizontal gaze nystagmus test "tracks the [horizontal] movements of the eyes in order to gauge whether an individual might be under the influence of an intoxicant." State v. Bell, 429 S.W.3d 524, 527 n.5 (Tenn. 2014) (citing State v. Murphy, 953 S.W.2d 200, 201-02 (Tenn. 1997)). "Nystagmus is an involuntary jerking movement of the eye either as it attempts to focus on a fixed point or as it moves to one side." Murphy, 953 S.W.2d at 202. "As a person who has been consuming alcohol attempts to follow [an object's horizontal] movement, . . . nystagmus will occur sooner and be more pronounced than it would be in a person who has not consumed any alcohol." Id.

[6] Deputy Strzelecki had received basic training on administering the HGN test in 2002, had completed a twenty-four hour course at the Governor's Highway Safety Office on standard field sobriety testing and alternate tests, including the HGN test, and had completed a thirty-two hour course on driving under the influence ("DUI"), which tested his proficiency on standard field sobriety tests, as well as the HGN test. Deputy Strzelecki had also watched videos by an expert on the HGN test, which included instruction about its scientific basis. Deputy Strzelecki had also served as a DUI instructor for the Knox County Sheriff's Office Training Academy and DUI task force member. He had made more than 350 DUI arrests and had "[a]ssist[ed] officers in better understanding the legal environment for DUI enforcement so they will become more skillful in DUI detection deterrence." The defendant objected to Deputy Strzelecki testifying as an expert regarding her performance on the HGN test, but the trial court overruled the defense objection, and this issue is not before us in this appeal.

[7] Deputy Strzelecki described the six clues as follows: "I take their vision out as far as they can see and hold it there for a minimum of four seconds, and you'll continue to see the eye twitch, and that's maximum deviation. The other test is—that's one clue for each eye. The other test is lack of smooth pursuit, and I'm taking about a two-second pass in front of each eye, watching for that lack of smoothness where the eye is jerking back and forth. And then the last part of the test is onset of nystagmus prior to [forty-five] degrees. So I go from [twelve] inches out, and I go up to about a [forty-five] degree angle and observe the person's eyes and watch for that onset to begin before I get to that [forty-five] degree point,

When Deputy Strzelecki asked the defendant if she would submit to the taking of a blood sample, she responded, "Do whatever you have to do." Deputy Strzelecki interpreted this statement as the defendant verbally consenting to a blood draw, so he did not read her the implied consent form, advise her of the legal consequences of refusing consent, obtain her written consent, provide <u>Miranda</u> warnings,[8] or place her under arrest. He explained that "[i]f a person consents, the procedure is we can get a blood draw. If the person refuses, at that point the implications of the implied consent violation are read to that person, and they're given another opportunity if they want to change their mind and decide to consent." At Deputy Strzelecki's request, a hospital phlebotomist came to the emergency department and, using the Tennessee Bureau of Investigation blood collection kit Deputy Strzelecki provided, drew two vials of blood from the defendant's arm. The vials were placed into the kit box, which was sealed, and Deputy Strzelecki later gave the sealed kit box to a forensic technician at the scene of the accident.[9] Asked whether the defendant's consent was the only reason for the blood draw, Deputy Strzelecki answered, "The consent and the fact that we're—it was a double fatality. . . . And also I smelled the alcohol and her admission of drinking and being the driver." He stated that he had reasonable suspicion that the defendant was driving while impaired.

In response to questioning by defense counsel, Deputy Strzelecki agreed that a medication known as Versed (also known as midazolam but hereinafter "Versed"), which the defendant had received before Deputy Strzelecki administered the HGN test, could have caused her to exhibit a positive effect on the HGN test. Deputy Strzelecki testified, however, that a "normal dosage, [and] therapeutic level" of the medication "wouldn't show a horizontal gaze nystagmus." Deputy Strzelecki acknowledged that he was not aware the defendant had received the medication when he adminstered the HGN test.

After the hearing on her first motion, but before the court ruled on her motion, the defendant filed an affidavit stating that she had no recollection of speaking with Deputy Strzelecki or consenting to the warrantless blood draw. She also filed copies of her medical records, including records from the paramedics who extricated her from the vehicle. These records indicated that the defendant was the driver of the vehicle, that she suffered a head injury and a compound fracture of her right radius/ulna, that her right pupil was "blown [and] non[-]reactive," that she reported not being able to see out of her right eye, and that she was "screaming she was deaf" while "holding her hearing aid in [her] hand." The defendant's right arm fracture was splinted with a pillow and her care

and [the defendant] exhibited all six clues."

[8] <u>Miranda v. Arizona</u>, 384 U.S. 436, 467-68 (1966).

[9] Deputy Strzelecki was not "100 percent sure" of the driver's identity, so he also obtained a blood sample from Mr. Page. This appeal relates only to the blood sample obtained without a warrant from the defendant.

transferred to LifeStar.[10]  The records indicated that defendant was unable to sign the form transferring her care because she was "immobilized."

LifeStar's medical records, which the defendant also submitted, identified her as the driver of the vehicle and described her as hearing impaired and as having an altered mental state, possibly due to "intoxicants."  The defendant's chief complaint was recorded as, "My wrist hurts and I am cold!"  Her pupils were described as "equal[,] round[,] and reactive."  While en route to the hospital, she received intravenously, at 9:28 p.m., four milligrams of morphine for pain control, and at 9:29 p.m., two milligrams of Versed to calm her.  At 9:35 p.m., LifeStar transferred the defendant's care to UT Medical Center.

At 9:36 p.m., the trauma nurse at UT Medical Center recorded the defendant as "deaf [and] unable to hear verbal commands," so commands were "written on paper [and] shown to" her.  Because the defendant "became combative," restraints were applied to her left wrist and to both her ankles.  At 9:45 p.m., the defendant was given two more milligrams of morphine, and at 9:47 p.m., and again at 9:50 p.m, she received two more milligrams of Versed, for a total of four milligrams.  All medications were administered intravenously.  Medical personnel noted that the defendant "became calm" and appeared to be sleeping after receiving these medications and described her as "resting comfortably" at 10:00 p.m.  At 10:17 p.m., she received two more milligrams of Versed. By 10:25 p.m., UT Medical Center records indicate that she was taken to x-ray, and the trauma nurse described the defendant as "more alert" and "moving all extremities."  At 10:30 p.m., the trauma nurse noted that "Lab" had come to the defendant's "bedside for legal draw!"

After considering the proof offered at the suppression hearing and the affidavit and medical records the defendant submitted afterwards, the trial court, on May 14, 2013, denied the defendant's motion to suppress, finding that the defendant had provided actual, verbal consent to the blood draw. The trial court accredited Deputy Strzelecki's testimony that, when he observed the defendant lying on the gurney in the hospital emergency room, she appeared to be alert and conscious, smelled of alcohol, told Deputy Strzelecki she had been drinking and driving, failed the HGN test, and, when asked if she would submit to a blood test, responded, "Do whatever you have to do."  The trial court concluded that "[t]he circumstances surrounding this question and response indicate that it was a knowing and voluntary consent."  The trial court explained that "[t]he defendant continued to acquiesce in the act of taking two vials of her blood after the request," and that there was "no indication" she "ever expressed any disagreement with the officer's interpretation of the statement as consent to draw blood."  The trial court gave "little

---

[10] LifeStar represents UT Medical Center and provides critical care treatment and aero medical transport via a fleet of helicopters.

evidentiary value" to the defendant's affidavit because she "did not testify at the hearing where she would [have been] subject to cross-examination," and the trial court referenced notations in the defendant's medical records indicating that she had been alert and able to communicate with medical personnel. The trial court acknowledged that the defendant had been medicated but emphasized that, by the time of the blood draw, she was described in the medical records as alert and moving her arms and legs. The trial court ruled that the defendant had orally consented to the blood draw, that Deputy Strzelecki had not relied on the implied consent statute to obtain the blood sample, and that it was "not relying on exigent circumstances in the present case."

In response to the trial court's denial of her motion, the defendant filed a second motion to suppress on July 29, 2013, "due to additional medical evidence" and requested another hearing. At the August 30, 2013 hearing on this second motion to suppress, the parties apparently agreed to confirm, rather than repeat, all evidence presented at the April hearing. The State introduced without objection the defendant's medical records from UT Medical Center, covering the period October 29, 2011, to November 5, 2011. Dr. John Robertson, Jr., a board-certified psychiatrist who had practiced in Knoxville since 1991, testified on the defendant's behalf about her capacity "to have given voluntary, knowing, and intelligent consent to a blood draw."

Prior to testifying, Dr. Robertson reviewed the medical records relating to the defendant's treatment after the accident. Dr. Robertson described the defendant's injuries as severe, explaining that she had sustained a laceration to her forehead, a contusion to her right eye, dislocated fractures of her right arm, upper right leg tissue swelling, bruises, and other injuries. Dr. Robertson emphasized the defendant's hearing impairment and pointed to the paramedic records indicating that her right pupil was "blown" and "non[-]reactive." Dr. Robertson observed that the defendant had received morphine and Versed following the accident, and he described the properties of the latter medication, explaining that it produces a calming, disinhibiting effect, and causes a patient to become compliant and "gentle and quiet." According to Dr. Robertson, Versed affects judgment and reasoning such that, "[Y]ou could ask [someone who received it] to do anything, and [that person] would do it." He noted that the defendant became combative and received additional doses of these medications intravenously which, Dr. Robertson opined, would have made their effect almost immediate and potent. He emphasized that by the time her blood was drawn around 10:30 p.m., the defendant had been given six milligrams of morphine and eight milligrams of Versed. Dr. Robertson testified that, given her injuries and the medications she received, the defendant would not have been capable of giving voluntary, knowing, and intelligent consent for the blood draw. He explained:

> [F]irst you've got the head injury even before she has any medication, and then to the extent that she is no longer dazed and confused by such . . . traumatic physical injuries and loss of consciousness related to the head

injury[, and] [t]hen she's got the psychological trauma of looking around and seeing people, bodies, dead and all the ambulance and the Life[]Star coming in picking her up. So you got all of this psychological trauma compounded on top of that, and then on the way, you've got these medications within minutes of getting—as soon as they can get an IV in, they're giving her something, and so they get the IV in, they give her some medicine to calm her down, to control the pain, and then she hits the ER, and then she's not calm enough. So—she's combative, and so they've got to give her more medication to calm her down, and each of these times they're not giving it for the heck of it, but she's getting—levels of agitation starting to go back up. The medicine's not wearing off. It's just that she requires quite a bit of medication here, and this is—this is enough to put someone down.

On cross-examination, Dr. Robertson acknowledged that his testimony was based on his general medical knowledge of the effects of the medications the defendant received, although he had "Googled" and looked up a few things on the Internet. He agreed that he had no way of knowing for sure how the medications had affected the defendant because he was not present to examine her on the evening of the accident. He also agreed that only the paramedics had recorded the defendant's right pupil as blown, while LifeStar records, as well as those of the admitting physician and trauma nurse at UT Medical Center, described the defendant's pupils as follows: (1) "Pupils equal, round and reactive to light"; (2) "The pupils are a size four, which are fairly small, and reactive bilaterally"; and (3) "Both eyes are reactive to light." Dr. Robertson also agreed that, prior to her arrival at the hospital, the defendant had been described as "Alert," and capable of reading lips, despite her hearing impairment. At counsel's request, Dr. Robertson read into the record the following nursing assessement entered at 11:30 p.m. on October 29, 2011, about an hour after the blood draw.

Patient has a hearing aid, but refuses to put it in. Patient was cussing at the nursing staff. Administered morphine after orders were in. Will monitor. Patient arrived on—up on the floor with symptoms of intoxication. Patient screaming to get up and use the restroom and states she is in a lot of pain. Interpreter with patient, but patient answering all of my questions. Interpreter states that he was called in, but clearly doesn't need.

Dr. Robertson nevertheless reiterated his opinion that the defendant lacked the capacity to give informed, intelligent, knowing, and voluntary consent to the blood draw as a result of the psychological and physical trauma she suffered in the accident and the "heavy doses" of medications she received before and after arriving at the hospital.

The State did not offer rebuttal proof after Dr. Robertson testified, but the trial court sua sponte recalled Deputy Strzelecki to the witness stand and asked him to

describe in more detail the conversation in which the defendant admitted she was driving the vehicle and said that everyone in the vehicle was drinking. Deputy Strzelecki responded, "She was on a gurney on her back in the ER. She was calm and alert, and when I approached her, I was standing over her. So she was on her back, and I was looking down." When asked if he had known the defendant was hearing impaired, Deputy Strzelecki replied, "At that time I did not." When asked whether the defendant was responding "verbally or in writing or what," Deputy Strzelecki stated, "Verbally." When asked, "Could you understand what she was saying?" Deputy Strzelecki answered, "Yes. And the conversation was very brief, and I could smell the alcohol on her, and at some point I asked if she would consent to a blood draw and . . . [h]er response was, 'Do what you have to do.'" When asked about the nature of their conversation before this exchange occurred, Deputy Strzelecki replied:

> I don't recall any other specific questions. It was a very brief conversation. I was trying to determine at that point who, in fact, was the driver. I was confident that was [the defendant], but there was also another surviving passenger in the car, and in that—all that chaos we hadn't determined 100 percent who was driving. So I had talked to the—to the passenger, and he had confirmed that she was the driver. She was still back in the ER, and she had acknowledged that she was driving. I don't recall if she nodded or had said yes, but she had confirmed that she was driving, and at that point I asked if she was willing to consent to a blood draw.

In response to additional questions, Deputy Strzelecki stated that he had told the defendant who he was when he first approached her, "[a]nd pretty much just was visually connecting eye contact between us, and the only actual sentence was the, 'Do whatever you have to do.'" Deputy Strzelecki stated that the defendant's eyes were open and her pupils equal and that her eyes were "tracking normally" when he administered the HGN test as he spoke with her. He reiterated that she had exhibited the six clues of intoxication on that test.

On September 3, 2013, the State submitted an audiorecording of a telephone conversation between the defendant and her father, which had been made when the defendant called her father from the jail on a regular phone, rather than a phone for the hearing impaired. The State submitted the recording to illustrate that the defendant's hearing impairment would not have impeded her ability to understand Deputy Strzelecki's request for her to consent to the blood draw.

One day later, September 4, 2013, the trial court entered an order granting the defendant's motion to suppress. The trial court found that the defendant had not actually consented to the blood draw and that Deputy Strzlecki lacked "reasonable grounds" to

believe the defendant was driving while intoxicated, which was required under the implied consent statute to justify the warrantless blood draw.[11] The trial court adopted and incorporated the findings of fact it made when initally denying the motion to suppress, but with "noted exceptions" and additional findings of fact. With respect to actual consent, the trial court stated that the testimony at the second hearing regarding

> the interaction between [Deputy] Strzelecki and the defendant paint[ed] a different picture than the one initially presented to the court at the first hearing. The court previously believed that the defendant had a verbal interchange with the officer where she verbally answered multiple questions. The added responses from the defendant concerning the consumption of alcohol and who was driving gave the phrase, "Do whatever you have to do" more credence as an intelligent and knowing response to the request for a blood test. When asked about what was specifically said by the defendant, the [deputy] acknowledged that the defendant only spoke one sentence during the entire brief conversation. The mere fact that the defendant non-verbally acknowledged that she was the driver gives the court much less confidence that she understood what was being asked of her when a blood sample was requested.
>
> The officer did not explain to the defendant that she could refuse to consent to the blood draw. Nor did he advise her that refusal to submit could result in a suspension of her driver's license. Although not required by the law in order for the consent to be valid, such advice would have gone a long way in ensuring that the consent was given from a free mind and rational intellect in this case. When she responded, "Do whatever you

---

[11] Tennessee Code Annotated section 55-10-406(a)(1) (Supp. 2011) provides that no test for determining the alcoholic or drug content of a person's blood "may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having *reasonable grounds* to believe the person was driving while under the influence of alcohol, a drug, any other intoxicant, or any combination of alcohol, drugs, or other intoxicants as prohibited by [section] 55-10-401, or was violating the provisions of [section] 39-13-106, [section] 39-13-213(a)(2)[,] or [section] 39-13-218." (Emphasis added). The term "reasonable grounds" is not statutorily defined, but Tennessee courts have equated it with "probable cause" and have used the terms interchangeably. See, e.g., State v. Bowery, 189 S.W.3d 240, 248 (Tenn. Crim. App. 2004) (equating "probable cause" with "reasonable grounds" regarding section 55-10-406); State v. Humphreys, 70 S.W.3d 752, 761 (Tenn. Crim. App. 2001) (same); cf. State v. Dotson, 450 S.W.3d 1, 50 n.22 (Tenn. 2014) (observing that the statutory term "reasonable cause" is synonymous with "probable cause"); State v. Bishop, 431 S.W.3d 22, 36 n.6 (Tenn. 2014) (stating that "reasonable cause" and "probable cause" are synonymous). For ease of reference and simplicity, this opinion uses "probable cause" rather than reasonable grounds when discussing Tennessee Code Annotated section 55-10-406(a)(1) (Supp. 2011). We note that a 2016 amendment to section 55-10-406(a) replaced "reasonable grounds" with "probable cause." See 2016 Tennessee Laws Pub. ch. 876 § 6.

have to do," the officer did not provide further clarification as to what he wanted to do or why. To be clear, the court does not find that [Deputy] Strzelecki has been deceptive in any way in his testimony. The court finds this officer to be quite credible. However, the more specific questions asked by the court during the second hearing, along with the additional proof from Dr. Robertson, present a more complete understanding of his interaction with the defendant and her ability to comprehend this interaction.

Here, we have a defendant in a hospital after a severe car accident. She has been given multiple doses of medications designed to calm her down and make her more compliant with demands and requests. She has some degree of hearing impairment that interferes with her ability to communicate. She has a brief interaction with a police officer who asks her to follow his pen with her eyes during the HGN test. He then asks her if she was the driver. She gives a non-verbal cue indicating in the affirmative. The officer asks her for a sample of her blood to which she responds, "Do whatever you have to do." Taking all of these factors into account the court now finds that the State has failed to prove by [a] preponderance of the evidence that this statement was a specific and intelligently given consent to have law enforcement take a sample of her blood for testing to determine possible impairment. It is just as likely that the defendant was complying with any request made of her due to the medication. Her one sentence response of acquiescence is insufficient to prove she was specifically consenting to a search of her blood.

(Citations omitted.)

With respect to its conclusion that Deputy Strzelecki lacked probable cause to believe the defendant was driving under the influence, the trial court pointed out that field sobriety tests were not administered and no testimony was offered to indicate the defendant's eyes were bloodshot or her speech slurred. The trial court also pointed to Deputy Strzelecki's testimony that the blood draw "would have been mandatory," because of the confirmed fatalities.[12] Accordingly, the trial court granted the defendant's second motion to suppress.

---

[12] As additional support for its conclusion that probable cause was lacking, the trial court referred to the defendant as not being arrested "until April of 2012, a year and half" after the accident occurred. This reference is inaccurate. The accident occurred in October 2011, about six months before the defendant's arrest. Additionally, the date of the defendant's arrest has no bearing on whether, on the night of the accident, Deputy Strzelecki had probable cause to believe the defendant was driving under the influence of an intoxicant when the accident occurred.

-11-

The State sought and obtained permission from the trial court and the Court of Criminal Appeals for an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9. In the intermediate appellate court, the State argued that "(1) exigent circumstances supported the blood draw; (2) [the] [d]efendant gave actual consent to the blood draw; and (3) the blood draw was authorized under the implied consent statute." State v. Reynolds, No. E2013-02309-CCA-R9-CD, 2014 WL 5840567, at *8 (Tenn. Crim. App. Nov. 12, 2014). The Court of Criminal Appeals affirmed the trial court's finding that the defendant had not given actual consent for the blood draw. Id. at *10. But the Court of Criminal Appeals concluded that Deputy Strzelecki had probable cause to believe that the defendant was driving under the influence of alcohol, which triggered the implied consent law and provided a basis for the warrantless blood draw. Id. at *12-13. The Court of Criminal Appeals enumerated the following circumstances as establishing probable cause: (1) the defendant was driving the automobile involved in a single-vehicle accident resulting in two fatalities; (2) Deputy Strzelecki noticed an odor of alcohol about the defendant's person; (3) the defendant admitted, either verbally or nonverbally, that she, and everyone in the vehicle, were drinking alcohol; and (4) the defendant's performance on the HGN test indicated that she was intoxicated. Id. at *12. The intermediate appellate court stated that even if the HGN test results were disregarded, "the other indicia of intoxication" were sufficient to establish probable cause. Id. The Court of Criminal Appeals rejected the defendant's argument that the implied consent statute is unconstitutional under the United States Supreme Court's decision in Missouri v. McNeely, 569 U.S. __, 133 S. Ct. 1552 (2013). Reynolds, 2014 WL 5840567, at *13.[13] The Court of Criminal Appeals explained the implied consent law's application in this case as follows:

> [The defendant] acquiesced to the terms of the implied consent law, specifically under subsection (f)(1), by obtaining a driver's license and driving on the streets and highways of Tennessee. At no time after the accident did she withdraw her consent or refuse to submit to the subsequent blood draw. We emphasize that the application of the Tennessee implied consent statute has not been held to be invalid or unconstitutional in this context—where an individual suspected of DUI, based upon probable cause, did not refuse to submit to a chemical test. Therefore, because we determine the officer had probable cause "to believe that [the defendant,]

---

[13] After stating that this issue had not been raised in the trial court and could be deemed waived, the Court of Criminal Appeals nevertheless decided to address "this . . . question of law that seems to be unsettled." Reynolds, 2014 WL 5840567, at *13. The State has not argued waiver in this Court. We also note that, in her "Memorandum in Support of Argument of Defendant in Regards to Various Pending Motions," filed in the trial court on May 1, 2013, the defendant challenged the implied consent statute as inconsistent with McNeely on the basis that it authorizes warrantless blood draws that do not fall into any exception to the state and federal constitutional warrant requirements. Thus, applying waiver would not be appropriate.

> the driver of a motor vehicle involved in an accident resulting in the injury or death of another . . . committed [DUI]" and because [the defendant] never refused to submit to the blood draw, the results of the blood test are admissible. T[enn]. C[ode] A[nn]. § 55-10-406(f)(1) (Supp. 2011).

Id. at *15 (footnote omitted).

Alternatively, the intermediate appellate court opined that, were the implied consent law held unconstitutional, the good-faith exception to the exclusionary rule should be adopted and applied to prevent suppression of the evidence in this case. Id. at *16. The Court of Criminal Appeals recognized that Tennessee has not formally adopted the good-faith exception. Id. Nevertheless, the intermediate appellate court opined that the facts of this case would fit squarely within the good-faith exceptions articulated in Davis v. United States, 564 U.S. 229 (2011), and Illinois v. Krull, 430 U.S. 340 (1987), were this Court to adopt these exceptions. Reynolds, 2014 WL 5840567, at *16.

We granted the defendant's application for permission to appeal and, in the order doing so, stated our particular interest in briefing and argument on the following issues:

> 1. Whether the Court should adopt the good-faith exception to the exclusionary rule, see United States v. Leon, 468 U.S. 897 (1984); and
>
> 2. [I]f so, whether the good-faith exception would preclude application of the exclusionary rule in this case.

State v. Reynolds, No. E2013-02309-SC-R11-CD (Tenn. Mar. 16, 2015) (order granting the application and specifying particular issues of interest to the Court for briefing and argument).

## II. Standard of Review

The standards governing an appellate court's review of a trial court's decision on a motion to suppress are well established. We uphold the trial court's findings of fact unless the evidence preponderates against them. State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014) (citing State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from [the] evidence." Bell, 429 S.W.3d at 529 (citing State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); Day, 263 S.W.3d at 900; Odom, 928 S.W.2d at 23). The lower court's application of law to facts is reviewed de

novo, with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). Determining the existence of probable cause "is a mixed question of law and fact that we review de novo." Bell, 429 S.W.3d at 529 (citing Ornelas v. United States, 517 U.S. 690, 696-98 (1996)).

## III. Analysis

### A. Probable Cause

#### 1. Arguments on Appeal

Both the trial court and the Court of Criminal Appeals concluded that the record does not support a finding that the defendant actually consented to the blood draw. The State has not challenged that conclusion on appeal, so we will not address that issue. Instead, the State argues that the implied consent law, specifically Tennessee Code Annotated sections 55-10-406(a)(1) and (f)(1) (Supp. 2011),[14] justifies the warrantless blood draw. The defendant argues that the implied consent law is inapplicable and cannot justify the warrantless blood draw because Deputy Strzelecki lacked probable cause to believe that the defendant was driving under the influence of an intoxicant at the time of the accident.

#### 2. History of Implied Consent Laws

"The problem of drunk driving arose almost as soon as motor vehicles came into use." Birchfield v. North Dakota, __ U.S. __, 136 S. Ct. 2160, 2167 (June 23, 2016) (citing James B. Jacobs, Drunk Driving: An American Dilemma 57 (1989)). The first drunk driving laws were enacted in 1906. Id. Thirty-three years later, Indiana enacted the first drunk driving law that defined presumptive intoxication based on blood-alcohol content ("BAC"); other states soon followed, and eventually all states had enacted laws of this type. Id. Enforcing these laws requires measuring BAC, and the two most commonly used means of doing so are blood tests and breath tests. Id. Although it is possible to forcibly immobilize a driver so that a blood sample can be drawn for testing, many states have prohibited this practice "to avoid violent confrontations." Id. (quoting South Dakota v. Neville, 459 U.S. 553, 559 (1983)). Breath tests clearly require a driver's cooperation. Id. at 2168. Because a driver's cooperation generally is needed when these tests are administered, "the enactment of laws defining intoxication based on BAC made it necessary for [s]tates to find a way of securing such cooperation. So-called 'implied consent' laws were enacted to achieve this result." Id. at 2168-69 (footnote

---

[14] This provision is now codified at Tennessee Code Annotated section 55-10-406(d)(5)(A) (Supp. 2015).

omitted). Implied consent laws generally provide that a motorist will be deemed to have consented to BAC testing as a condition of the privilege of driving on state roads and that the driving privilege will be rescinded if a suspected drunk driver refuses to cooperate with BAC testing. Id. at 2169. New York enacted the first implied consent laws in 1953. Id. By 1962, the Uniform Vehicle Code included an implied consent provision. Id. "Today, 'all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense.'" Id. (quoting McNeely, 569 U.S. at ____, 133 S. Ct. at 1566 (plurality opinion)). Driver's license suspension or revocation remains the standard legal consequence of refusing to cooperate with BAC testing. Id. Additionally, a motorist's refusal to submit to BAC testing is admissible in any subsequent legal proceeding arising from the motorist's drunk driving. Id.

### 3. Tennessee's Implied Consent Laws

Tennessee first adopted an implied consent law in 1969. See Act of May 9, 1969, ch. 292, §§ 2, 3, 5, 1969 Tenn. Pub. Acts 832, 833-35. At the time of the defendant's accident in October 2011, Tennessee's implied consent law provided in relevant part as follows:

(a)(1) Any person who drives a motor vehicle in this [S]tate is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests. However, no such test or tests may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having [probable cause] to believe the person was driving while under the influence of alcohol, a drug, any other intoxicant[,] or any combination of alcohol, drugs, or other intoxicants as prohibited by [section] 55-10-401, or was violating the provisions of [section] 39-13-106, [section] 39-13-213(a)(2)[,] or [section] 39-13-218.

. . . .

(f)(1) If a law enforcement officer has probable cause to believe that the driver of a motor vehicle involved in an accident resulting in the injury or death of another has committed a violation of [section] 55-10-401 [(driving under the influence of an intoxicant)], [section] 39-13-213(a)(2) [(vehicular homicide),] or [section] 39-13-218 [(aggravated vehicular homicide)], the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood. The test shall be performed in accordance with the procedure set forth in this section and shall be

performed regardless of whether the driver does or does not consent to the test.

. . . .

(4) The results of a test performed in accordance with subdivision (f)(1) may be offered as evidence by either the [S]tate or the driver of the vehicle in any court or administrative hearing relating to the accident or offense subject to the Tennessee Rules of Evidence.

Tenn. Code Ann. § 55-10-406(a)(1), (f)(1), (f)(4) (Supp. 2011). The defendant is correct that, if Deputy Strzelecki lacked probable cause to believe she was driving under the influence, the implied consent statute does not provide authority for the blood draw. To resolve the first issue in this appeal, we therefore focus on probable cause.

### 4. Legal Standards for Determining Probable Cause

Probable cause has often been the topic of discussion in judicial decisions throughout this country. Bell, 429 S.W.3d at 530. "Articulating precisely what . . . 'probable cause' mean[s] is not possible." Ornelas, 517 U.S. at 695. Probable cause is "more than a mere suspicion," State v. Lawrence, 154 S.W.3d 71, 76 (Tenn. 2005), but less than absolute certainty, see State v. Melson, 638 S.W.2d 342, 350 (Tenn. 1982). "[T]he strength of the evidence necessary to establish probable cause to arrest is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." State v. Bishop, 431 S.W.3d 22, 41 (Tenn. 2014); see also Adams v. Williams, 407 U.S. 143, 148-49 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."). "'[I]t is irrelevant to the probable cause analysis what crime a suspect is eventually charged with or whether a person is later acquitted of the crime for which she or he was arrested.'" State v. Davis, 484 S.W.3d 138, 144 (Tenn. 2016) (quoting Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005)).

"[T]he probable[-]cause standard is . . . practical, nontechnical," State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989) (citations and internal quotation marks omitted), and focuses upon "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," Draper v. United States, 358 U.S. 307, 313 (1959) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also Echols, 382 S.W.3d at 278; Melson, 638 S.W.2d at 351.

The process [for assessing probable cause] does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do

the same—*and so are law enforcement officers*. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, *but as understood by those versed in the field of law enforcement*.

Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion) (emphases added) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

As a result, "[d]eterminations of probable cause are extremely fact-dependent." Bell, 429 S.W.3d at 534-35 (citing Ker v. California, 374 U.S. 23, 33 (1963); State v. Garcia, 123 S.W.3d 335, 344 (Tenn. 2003)). As this Court long ago recognized, it is not possible to define probable cause "in terms to fit all cases arising. Each case must stand on its own facts." Dittberner v. State, 291 S.W. 839, 840 (Tenn. 1927). Defining the concept too narrowly "would open the way for the escape of desperate criminals and the defeat of justice," while construing it too broadly "would lead to the harassment of the innocent." Id. Nevertheless, officers are not "required to wait . . . for evidence which would convict." Id. Probable cause exists when "the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." Echols, 382 S.W.3d at 277-78 (alterations, citations, and internal quotation marks omitted).

"It must always be remembered that probable cause is evaluated 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Frazier v. Williams, 620 F. Supp. 2d 103, 108 (D.D.C. 2009) (quoting Wolfe v. Perry, 412 F.3d 707, 717 (6th Cir. 2005)). Because the assessment of probable cause is reviewed from a purely objective perspective, the officer's subjective state of mind is irrelevant. Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006); see also Bell, 429 S.W.3d at 530 ("[I]t matters not whether the arresting officers themselves believed that probable cause existed."); State v. Huddleston, 924 S.W.2d 666, 676 (Tenn. 1996) (recognizing that an officer's subjective belief that he lacked probable cause to obtain a warrant is irrelevant to the court's determination of whether probable cause actually existed). A reviewing court may consider all relevant facts and circumstances demonstrated by the proof, including those not relied upon by the officer. See State v. Smith, 484 S.W.3d 393, 402 (Tenn. 2016) (applying these principles to a reviewing court's assessment of the existence of reasonable suspicion).

*5. Application of Probable Cause Legal Standards*

Applying these legal standards, we conclude that, at the time Deputy Strzelecki directed medical staff to obtain a sample of the defendant's blood, probable cause existed to believe that the defendant was driving under the influence of an intoxicant at the time of the accident. Deputy Strzelecki was initially dispatched to UT Medical Center to speak with the survivors of a single car accident that had likely resulted in fatalities.

While en route to the hospital, he learned from other officers that the accident had indeed resulted in two fatalities. He also learned the identities of the survivors and that the defendant was likely the driver. Thus, by the time Deputy Strzelecki arrived at the hospital, he knew the importance of identifying the driver and determining the cause of the accident. Deputy Strzelecki spoke first with Mr. Page, who confirmed that he had been a passenger in the vehicle and the defendant had been driving the vehicle at the time of the accident. Deputy Strzelecki then located and spoke with the defendant. He identified himself and maintained eye contact with the defendant throughout their conversation. Although the defendant had sustained injuries in the accident and was lying on a gurney in the hospital emergency room when Deputy Strzelecki spoke with her, he testified that the defendant's eyes were open and her pupils were equal and tracking normally.

Deputy Strzelecki's testimony was corroborated by notations of medical professionals in the LifeStar and UT Medical Center records that were introduced as evidence in the suppression hearings. Deputy Strzelecki, who was well-versed in the field of law enforcement and particularly DUI enforcement, administered the HGN test and concluded that the defendant exhibited all six clues of intoxication. Additionally, during the hearing on the defendant's first motion to suppress, Deputy Strzelecki testified that the defendant admitted she had been drinking and driving. At the hearing on the second motion, Deputy Strzelecki again testified that the defendant admitted she was driving the vehicle, but he neither repeated nor retracted his earlier testimony that she had also admitted to drinking.

Rather, in response to specific questions from the trial court, Deputy Strzelecki acknowledged that his conversation with the defendant had been very brief and that the defendant had *spoken* only one complete *sentence*, consisting of "Do whatever you have to do," when he broached the subject of obtaining a blood sample. Deputy Strzelecki's testimony that the defendant *spoke* only one complete *sentence* during their conversation does not conflict with the testimony he gave at the first hearing regarding the defendant admitting to drinking *and* driving. As the trial court recognized, the defendant may have used nonverbal responses, or she may have used incomplete sentences or single-word answers to communicate with Deputy Strzelecki.

Thus, while Deputy Strzelecki's testimony at the second hearing differed from his testimony at the first hearing, his testimony at the two hearings was not inconsistent. At both suppression hearings Deputy Strzelecki testified that he smelled an odor of alcohol on and about the defendant when he spoke with her at the hospital. The trial court, which observed him testify, specifically found Deputy Strezelecki "to be quite credible" and not "deceptive in any way in his testimony."

Moreover, any adverse affect the medications had on the defendant's performance on the HGN test is not relevant to the probable cause assessment because Deputy

Strzelecki was unaware the defendant had received those medications when he administered the test. As already noted, when determining whether probable cause exists, courts only consider "the facts and circumstances *within the knowledge of the officers, and of which they had reasonably trustworthy information*" at the time the challenged search or seizure occurred and do not apply 20/20 hindsight when gauging the existence of probable cause. Echols, 382 S.W.3d at 277-78 (emphasis added) (citations and internal quotation marks omitted). Also not relevant to the probable cause determination are Deputy Strzelecki's subjective beliefs that the defendant had actually consented to the blood draw and that he had only reasonable suspicion of DUI. Again, the determination of probable cause involves an objective assessment of the facts and circumstances within the knowledge of the officers. Having applied the relevant legal standards, we conclude that the totality of the facts and circumstances—including the defendant's admission to drinking and driving, the odor of alcohol on and about her person, and her poor performance on the HGN test—were sufficient to warrant a prudent officer in believing that the defendant was driving under the influence of an intoxicant when the accident occurred. Accordingly we reject the defendant's argument that probable cause was lacking. Thus, the probable cause necessary to trigger application of the implied consent law existed here.

## B. Statutory Implied Consent and the Consent Exception to the Warrant Requirement

We next consider the State's argument that the implied consent law satifies the consent exception to the warrant requirement and justifies the warrantless blood draw. The defendant asserts that it does not and argues that the practice of obtaining blood samples without a warrant was not based on the implied consent law but upon the widely held erroneous belief that the natural dissipation of alcohol in the bloodstream qualified as an exigency, sufficient to justify a warrantless blood draw pursuant to the exigent circumstances exception in every drunk driving case. See Schmerber v. California, 384 U.S. 757 (1966). The State responds that, despite any misunderstanding of Schmerber, Tennessee's implied consent law satisfies the consent exception to the warrant requirement and justifies warrantless blood draws, like the one at issue in this appeal, so long as a motorist does not withdraw or revoke the statutorily implied consent. We begin our discussion with the applicable constitutional provisions.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no [w]arrants shall issue, but upon probable cause." U.S. Const. amend. IV.[15] Likewise, article I, section 7 of the

---

[15] The Fourth Amendment applies to the States through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

Tennessee Constitution guarantees that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures," and that "general warrants" lacking particularity and evidentiary support "ought not to be granted." Tenn. Const. art. I, § 7. "[A]rticle I, section 7 is identical in intent and purpose with the Fourth Amendment." State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)).[16] Both constitutional provisions prohibit only unreasonable *searches and seizures* and are not implicated unless a search or seizure has actually occurred. State v. McCormick, 494 S.W.3d 673, 678-79 (Tenn. 2016). Because "the taking of a blood sample . . . is a search," these constitutional protections are implicated in this case. Birchfield, 136 S.Ct. 2173 (citing Skinner v. Ry. Labor Execs. Assn., 489 U.S. 602, 616-17 (1989); Schmerber, 384 U.S. at 767-68); see also McNeely, 133 S. Ct. at 1558 (recognizing that a blood draw is a Fourth Amendment search); State v. Scarborough, 201 S.W.3d 607, 616 (Tenn. 2006) (recognizing that collection of a DNA sample is a search).

Although the text of the Fourth Amendment and article 1, section 7 does not specify when a warrant must be obtained, the general rule is that a warrant ordinarily should be obtained because warrants are the safeguard against unreasonable searches. Kentucky v. King, 563 U.S. 452, 459 (2011) (stating that under the Fourth Amendment "a warrant must generally be secured"); State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) ("[A]s a general matter, law enforcement officials cannot conduct a search [or effect a seizure] without having first obtained a valid warrant." (internal citations omitted)).[17] However, the warrant requirement "is subject to a number of exceptions." Birchfield, 136 S. Ct. at 2173; see also Meeks, 262 S.W.3d at 722 (listing some of the "commonly recognized exceptions to the requirement of a warrant"). These exceptions derive from the premise that "[t]he ultimate touchstone of the Fourth Amendment is

[16] This Court remains "free to interpret the provisions of [the Tennessee] constitution to afford greater protection than the federal constitution." State v. Cox, 171 S.W.3d 174, 183 (Tenn. 2005). Nevertheless, article I, section 7 has generally been interpreted consistently with the Fourth Amendment, except where federal decisions provide less protection than that afforded by existing Tennessee decisions representing a "settled development of state constitutional law." State v. Lakin, 588 S.W.2d 544, 549 n.2 (Tenn. 1979); see generally State v. Richards, 286 S.W.3d 873, 877-78 (Tenn. 2009) (enumerating Tennessee decisions interpreting article I, section 7 differently than the Fourth Amendment). With respect to the issues presented in this appeal, we conclude that the Fourth Amendment and article I, section 7 are co-extensive. See State v. McCormick, 494 S.W.3d 673, 683-84 (Tenn. 2016) (holding that, for purposes of traffic stops, article I, section 7 and the Fourth Amendment are co-extensive).

[17] The warrant requirement serves the "essential purpose" of assuring citizens "that such intrusions are not the random or arbitrary acts of government agents[,]. . . . that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope." Skinner, 489 U.S. at 621-22 (citations omitted). The warrant requirement "also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case." Id. at 622 (citations omitted).

'reasonableness.'" King, 563 U.S. at 459 (quoting Brigham City, 547 U.S. at 403); see also Meeks, 262 S.W.3d at 722. Thus, although a warrantless search is presumptively unreasonable, Yeargan, 958 S.W.2d at 629, this presumption may be overcome if the State demonstrates by a preponderance of the evidence that the warrantless search—here the warrantless blood draw—was conducted pursuant to an exception to the warrant requirement, see King, 563 U.S. at 459; Bell, 429 S.W.3d at 529; Meeks, 262 S.W.3d at 722.

Exigent circumstances is one such exception. Mincey v. Arizona, 437 U.S. 385, 392-93 (1978); Meeks, 262 S.W.3d at 722. The exigent circumstances exception applies when the "urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant." Meeks, 262 S.W.3d at 723 (footnote omitted). When the exigent circumstances exception is the proffered basis for a warrantless search, a reviewing court must determine "whether the circumstances g[a]ve rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." Id. (footnote omitted). In making this determination, a court considers "the totality of the circumstances known to the governmental actor" at the time of the warrantless search or seizure. Id. (footnote omitted). The State may point to any "specific and articulable facts and the reasonable inferences drawn from them" available at the time of the warrantless search or seizure. Id. at 724 (footnotes omitted). A reviewing court evaluates the circumstances "from an objective perspective; the governmental actor's subjective intent is irrelevant." Id. (footnote omitted).

In Schmerber, 384 U.S. at 757, decided three years *before* Tennessee enacted its first implied consent law, the United States Supreme Court applied the exigent circumstances exception to uphold a warrantless blood draw in a drunk driving case. The defendant in Schmerber sustained injuries in an automobile accident and was transported to a hospital for treatment. Id. at 758. Without procuring a warrant, a police officer directed a physician to draw the defendant's blood, which was then tested to determine BAC. Id. The defendant was arrested, and the test results were used to convict him of driving under the influence of alcohol. Id. at 758-59. In concluding that the warrantless blood draw was constitutionally reasonable, the Supreme Court explained:

> The officer in [Schmerber] . . . might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence[.] We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of

blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

Id. at 770-71 (citations and internal quotation marks omitted).

Courts applying Schmerber disagreed about its meaning. Some courts interpreted it as simply adopting the totality of the circumstances test for purposes of determining whether the exigent circumstances exception was satisfied. See, e.g., State v. Johnson, 744 N.W.2d 340 (Iowa 2008); State v. Rodriguez, 156 P.3d 771 (Utah 2007). Other courts interpreted Schmerber as announcing a broad, categorical rule that the natural dissipation of alcohol from the bloodstream constitutes an exigency justifying a warrantless blood draw in every drunk driving case. See, e.g., State v. Shriner, 751 N.W.2d 538 (Minn. 2008); State v. Machuca, 227 P.3d 729 (Or. 2010) (en banc); State v. Bohling, 494 N.W.2d 399 (Wis. 1993). Tennessee courts fell into this latter category and intepreted Schmerber broadly as establishing a per se rule equating alcohol dissipation to exigent circumstances justifying a warrantless blood draw, so long as the officer had probable cause to believe the motorist was driving while intoxicated. See, e.g., State v. Humphreys, 70 S.W.3d 752, 760-61 (Tenn. Crim. App. 2001) ("Based upon the fact that evidence of blood alcohol content begins to diminish shortly after drinking stops, a compulsory breath or blood test, taken with or without the consent of the donor, falls within the exigent circumstances exception to the warrant requirement.").

The disagreement about the scope of Schmerber as it related to the exigent circumstances exception persisted until three years ago, when the United States Supreme Court addressed whether the natural metabolization of alcohol in the bloodstream creates a "per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." McNeely, 133 S. Ct. at 1556. The Supreme Court rejected a per se rule and held, "consistent with general Fourth Amendment principles, that exigency in this context must be determined case by case based on the totality of the circumstances." Id. McNeely did not provide "the Court with an adequate analytic framework for a detailed discussion of all the relevant factors that can be taken into account in determining the reasonableness of acting without a warrant." Id. at 1568. Nevertheless, the McNeely Court emphasized that, "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id. at 1561.

The majority decision in McNeely dealt only with the exigent circumstances exception. Id. at 1568; Birchfield, 136 S. Ct. at 2183. However, the plurality opinion in McNeely described implied consent laws as one of the "broad range of legal tools [available to states] to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws." 133 S. Ct. at 1566 (plurality opinion). The McNeely plurality also noted that implied consent laws "impose

significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution." Id.

In this appeal, the State has argued that the McNeely plurality's discussion indicates that a warrantless blood draw pursuant to the implied consent law "withstands Fourth Amendment scrutiny, at least where there has been no withdrawal or revocation of consent." As additional support for its position, the State has relied on Court of Criminal Appeals decisions, decided both before and after McNeely, holding that statutory implied consent qualifies as consent for purposes of the separate consent exception to the state and federal constitutional warrant requirements. See, e.g., Humphreys, 70 S.W.3d at 761; State v. Smith, W2015-00133-CCA-R9-CD, 2015 WL 9177646, at *4 (Tenn. Crim. App. Dec. 15, 2015); State v. Walker, No. E2013-01914-CCA-R3-CD, 2014 WL 3888250, at *5-6 (Tenn. Crim. App. Aug. 8, 2014). But see State v. Wells, No. M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *13 (Tenn. Crim. App. Oct. 6, 2014) (holding that the implied consent law does not satisfy the consent exception to the warrant requirement and also holding that the implied consent law does not authorize warrantless blood draws); State v. Kennedy, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *12 (Tenn. Crim. App. Oct. 3, 2014) (same).

The consent exception to the warrant requirement applies when a person voluntarily consents to a search. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); State v. Berrios, 235 S.W.3d 99, 109 (Tenn. 2007). The State has the burden to prove that "consent was, in fact, freely and voluntarily given." Schneckloth, 412 U.S. at 222 (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). "The pertinent question is . . . whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005) (citing Schneckloth, 412 U.S. at 225-26); see also Berrios, 235 S.W.3d at 109. Answering this question of fact requires consideration of the totality of the circumstances in each case. Schneckloth, 412 U.S. at 227; Cox, 171 S.W.3d at 184, 186. Relevant circumstances include the time and place of the encounter, level of hostility, if any, between the police and the individual, and the number of officers present, as well as the individual's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel." Cox, 171 S.W.3d at 185 (internal quotation marks omitted). The individual's "[k]nowledge of the right to refuse consent" is also a circumstance that should be considered. Id. (citing Schneckloth, 412 U.S. at 235-47).

After this appeal was briefed and argued, the United States Supreme Court rendered a decision in which implied consent laws were discussed, see Birchfield, 136

S.Ct. at 2160, and this Court directed the parties to this appeal to file supplemental briefs to address the impact, if any, <u>Birchfield</u> has on this appeal, <u>State v. Reynolds</u>, No. 2013-02309-SC-R11-CD (Tenn. Sept. 6, 2016) (order directing the parties to file, by September 23, 2016, supplemental briefs addressing <u>Birchfield</u>).  As the parties recognize in their supplemental briefs, the Supreme Court's primary holding in <u>Birchfield</u> was "that a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving.  As in all cases involving reasonable searches incident to arrest, a warrant is not needed in this situation."  <u>Id.</u> at 2185 (footnote omitted).  The Supreme Court concluded, however, "that the search incident to arrest doctrine does not justify the warrantless taking of a blood sample."  <u>Id.</u>  Next, the Supreme Court addressed "the alternative argument that [warrantless blood] tests are justified based on the driver's legally implied consent to submit to them."  <u>Id.</u>  In addressing this argument, the Court stated:

> It is well established that a search is reasonable when the subject consents, and that sometimes consent to a search need not be express but may be fairly inferred from context.  Our prior opinions have referred approvingly to the general concept of implied-consent laws *that impose civil penalties and evidentiary consequences on motorists who refuse to comply.*  Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them.

> It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test.  There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads.

> Respondents and their amici all but concede this point. North Dakota emphasizes that its law makes refusal a misdemeanor and suggests that laws punishing refusal more severely would present a different issue. Borrowing from our Fifth Amendment jurisprudence, the United States suggests that motorists could be deemed to have consented to only those conditions that are "reasonable" in that they have a "nexus" to the privilege of driving and entail penalties that are proportional to severity of the violation.  But in the Fourth Amendment setting, this standard does not differ in substance from the one that we apply, since reasonableness is always the touchstone of Fourth Amendment analysis.  And applying this standard, we conclude *that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense.*

<u>Id.</u> at 2185-86 (internal citations omitted) (emphases added).  In applying its holdings to one of the three consolidated cases before it, the Supreme Court stated:

Unlike the other petitioners, [Steve Michael] Beylund was not prosecuted for refusing a test. *He submitted to a blood test after police told him that the law required his submission,* and his license was then suspended and he was fined in an administrative proceeding. The North Dakota Supreme Court held that Beylund's consent was voluntary on the erroneous assumption that the State could permissibly compel both blood and breath tests. *Because voluntariness of consent to a search must be determined from the totality of all the circumstances, we leave it to the state court on remand to reevaluate Beylund's consent given the partial inaccuracy of the officer's advisory.*

Id. at 2186 (emphases added) (citations and quotation marks omitted).

Birchfield arguably can be read to support the State's argument because it appears to suggest that statutory implied consent may in some circumstances satisfy the consent exception to the warrant requirement because a motorist's act of driving on state roads is deemed consent. However, the manner in which the Birchfield Court applied its holding to Mr. Beylund's case can also be read as supporting the defendant's argument that the adequacy of consent for purposes of an exception to the constitutional warrant requirement must be determined based on the totality of the facts and circumstances of each particular case, rather than implying consent from a motorist's action in driving on state roads. Because Mr. Beylund consented only after receiving erroneous information about his ability to refuse consent and the consequences of doing so, the Supreme Court in Birchfield declined to rely on implied consent alone and remanded for a determination of whether his consent was voluntary, given the totality of the circumstances.

Thus, although Birchfield shed some light, it failed to answer definitively the question of whether implied consent satisfies the consent exception to the warrant requirement. Based on the limited guidance Birchfield provided, the unusual facts of this case, and our ability to resolve this appeal on another ground, we decline to determine in this appeal whether the implied consent statute satisfies the consent exception to the warrant requirement or whether the implied consent statute violates the federal or state constitution by authorizing warrantless blood draws.

Here, Deputy Strzelecki did not rely primarily on the implied consent law in obtaining the defendant's blood. Rather, he erroneously believed that the defendant had actually consented to the blood draw, and he viewed the blood draw as mandatory, regardless of the defendant's consent, because the accident involved fatalities. As a result, he did not advise the defendant of her ability to decline consent to the blood draw or of the consequences of doing so. The State has not challenged the lower courts' conclusion that the defendant did not voluntarily consent to the blood draw and has

argued only that the implied consent law satisfies the consent exception in situations, such as this one, where the defendant did not revoke or withdraw her implied consent.[18] But, even if we assume the State's argument is correct, the State cannot prevail in this appeal. Given the lower courts' conclusion that the defendant did not actually consent to the blood draw and the trial court's factual findings based upon medical proof in the record regarding the defendant's physical condition and the adverse affects the medications had on her judgment and reasoning, the record does not establish that the defendant had the capacity to revoke her statutory implied consent. And, as already explained, under the consent exception to the warrant requirement, the State bears the burden of establishing that the defendant's consent was voluntary. Schneckloth, 412 U.S. at 222 (providing that the State has the burden to prove that "consent was, in fact, freely and voluntarily given" (quoting Bumper, 391 U.S. at 548)). Nevertheless, even if the warrantless blood draw violated the state and federal constitutional prohibitions against unreasonable searches, we conclude, as explained hereinafter, that the exclusionary rule does not require suppression of the evidence because the warrantless blood draw was conducted in objectively reasonable, good-faith reliance on binding precedent. Therefore, given the unusual facts in this case, and because this issue is not determinative to the outcome of this appeal, we decline to decide here whether the implied consent law satisfies the consent exception to the warrant requirement.[19]

---

[18] The State also has not appealed from the Court of Criminal Appeals' conclusion that waiver forecloses its argument that the warrantless blood draw was justified by the exigent circumstances exception. Reynolds, 2014 WL 5840567, at *9 n.6.

[19] Courts in the following jurisdictions have refused to hold that statutory implied consent satisfies the consent exception to the warrant requirement. Flonnory v. State, 109 A.3d 1060, 1065 (Del. 2015); State v. Wulff, 337 P.3d 575, 581 (Idaho 2014); State v. Declerck, 317 P.3d 794, 804 (Kan. Ct. App. 2014); State v. Modlin, 867 N.W.2d 609, 619 (Neb. 2015); Byars v. State, 336 P.3d 939, 946 (Nev. 2014); State v. Fierro, 853 N.W.2d 235, 243 (S.D. 2014); Aviles v. State, 443 S.W.3d 291, 294 (Tex. App. 2014); Weems v. State, 434 S.W.3d 655, 665 (Tex. App. 2014). Although an intermediate appellate court in California had suggested in dicta that statutory implied consent may satisfy the consent exception, the California Supreme Court recently accepted review of another case to consider that issue and several others. See People v. Arredondo, 371 P.3d 240 (Cal. 2016) (granting review to consider the following issues: "Did law enforcement violate the Fourth Amendment by taking a warrantless blood sample from defendant while he was unconscious, or *was the search and seizure valid* because defendant expressly consented to chemical testing when he applied for a driver's license or *because defendant was 'deemed to have given his consent' under California's implied consent law?* Did the People forfeit their claim that defendant expressly consented? If the warrantless blood sample was unreasonable, does the good faith exception to the exclusionary rule apply because law enforcement reasonably relied on [a statute] in securing the sample?" (emphases added)).

### C. Good-faith Exception to the Exclusionary Rule

The United States Supreme Court created the exclusionary rule as a remedy for Fourth Amendment violations in <u>Weeks v. United States</u>, 232 U.S. 383 (1914). <u>See Davis</u>, 564 U.S. at 236 (stating that the exclusionary rule "is a prudential doctrine . . . created by [the United States Supreme] Court to compel respect for the constitutional guaranty" (citation and internal quotation marks omitted)); <u>United States v. Calandra</u>, 414 U.S. 338, 348 (1974) (stating that the exclusionary "rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved"); <u>Huddleston</u>, 924 S.W.2d at 672 ("The exclusionary rule was developed as a remedy for the violation of Fourth Amendment strictures . . . ."). The issue in <u>Weeks</u> was whether the Fourth Amendment compelled the suppression and return of evidence collected from a warrantless search of the defendant's home. <u>See Weeks</u>, 232 U.S. at 389. The <u>Weeks</u> Court concluded that, upon the defendant's application for the return of this evidence during the course of his federal prosecution, the district court should have "restored" this evidence to the accused. <u>Id.</u> The Supreme Court explained that the lower court committed "prejudicial error" by holding the evidence and permitting its use at trial. <u>Id.</u>

Eight years after <u>Weeks</u>, this Court considered whether evidence discovered in a warrantless search of the defendant's vehicle in violation of article I, section 7 was unlawfully admitted at the defendant's trial. <u>Hughes v. State</u>, 238 S.W. 588, 594 (Tenn. 1922). Relying on <u>Weeks</u>, this Court adopted the exlusionary rule as a remedy applicable to evidence "produced by violating the constitutional protection against unlawful searches and seizures." <u>Id.</u> The Court explained:

> The state, having through its executive representatives produced the evidence of a violation of the law by one of its citizens by means prohibited by the Constitution, cannot be permitted through its judicial tribunal to utilize the wrong thus committed against the citizen to punish the citizen for his wrong; for it was only by violating his constitutionally protected rights that his wrong has been discovered.

<u>Id.</u>; <u>see also</u> <u>Hampton v. State</u>, 252 S.W. 1007, 1009 (Tenn. 1923) ("[W]here the action of the governmental authorities is unlawful and violative of the constitutional rights of the citizen, and directly developed and disclosed the facts of the violation of the law, the government cannot rely upon the evidence thus unlawfully obtained by its agents." (quoting <u>Youman v. Commonwealth</u>, 224 S.W. 860 (Ky. 1920))). In <u>Mapp v. Ohio</u>, decided in 1961, the United States Supreme Court applied the exclusionary rule to the States through the Fourteenth Amendment Due Process Clause. 367 U.S. at 655. Thus, the exclusionary rule has long been available in Tennessee as a remedy for violations of the federal and state constitutional protections against unreasonable searches and seizures.

Although Mapp declared that "all evidence obtained by searches and seizures in violation of the Constitution is . . . inadmissible in a state court," id. at 655, one year before Mapp, the Supreme Court explained that "[t]he [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217 (1960); see also Arizona v. Evans, 514 U.S. 1, 14 (1995) ("[T]he exclusionary rule was historically designed as a means of deterring police misconduct . . . ."). Recently, the Supreme Court reaffirmed that "the *sole* purpose of the exclusionary rule is to deter misconduct by law enforcement." Davis, 564 U.S. at 246.

To ensure that the exclusionary rule serves this single purpose, the Supreme Court has adopted good-faith exceptions to the exclusionary rule, beginning with United States v. Leon, 468 U.S. 897 (1984). In Leon, the Court examined whether the exclusionary rule precludes the admission of evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." Id. at 900. After noting that the exclusionary rule "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved,'" id. at 906 (quoting Calandra, 414 U.S. at 348), the Leon Court decided that the "substantial social costs" of excluding incriminating evidence outweigh the exclusionary rule's benefit "when law enforcement officers have acted in objective good faith or their transgressions have been minor," id. at 907-08. The Leon Court concluded that the exclusionary rule is unwarranted when exclusion "does not result in appreciable deterrence." Id. at 909 (citation omitted). The Leon Court noted, however, that the good-faith exception does not apply "where the issuing magistrate wholly abandoned his judicial role" or where the warrant was so facially deficient "that the executing officers cannot reasonably presume it to be valid." Id. at 923.

In subsequent decisions, the Supreme Court has applied the rationale of Leon to recognize additional good-faith exceptions in different factual and legal scenarios, where applying the exclusionary rule would not result in appreciable deterrence. See, e.g., Davis, 564 U.S. at 240 (holding that the exclusionary rule does not apply when the police conduct a search in objectively reasonable reliance on binding appellate precedent); Herring v. United States, 555 U.S. 135 (2009) (refusing to apply the exclusionary rule when law enforcement officers reasonably relied in good faith on a database managed by the police); Evans, 514 U.S. at 3-4 (declining to apply the exclusionary rule when law enforcement officers reasonably relied in good faith on a database managed by the judiciary); Krull, 480 U.S. at 340 (declining to apply the exclusionary rule when law enforcement officers reasonably relied in good faith on a statute later declared unconstitutional).

In Davis, the most recent Supreme Court decision discussing the good-faith exception, the police arrested Davis in April 2007, handcuffed him, and placed him in a squad car. 564 U.S. at 235. The police then searched the passenger compartment of the vehicle Davis had occupied before his arrest and found a revolver, which was used to convict Davis of unlawful possession of a firearm. Id. At the time of Davis's arrest, binding appellate precedent authorized the search of the vehicle as one incident to his arrest. Id. However, while Davis's case was pending on direct appeal, the Supreme Court decided Arizona v. Gant, 556 U.S. 332 (2009), which overruled the precedent that had authorized the search. Gant applied to Davis, because Davis's case was pending on direct appeal when Gant was decided, and Gant rendered the search unconstitutional. Davis, 564 U.S. at 236. The Supreme Court nevertheless refused to overturn Davis's conviction, holding that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." Id. at 241. The Court explained that suppressing evidence obtained by "[t]he police act[ing] in strict compliance with binding precedent" would only deter "conscientious police work." Id. at 240-41. The Davis Court limited its holding to circumstances in which "binding appellate precedent specifically *authorizes* a particular police practice," and police "scrupulously adhered to governing law." Id. at 241, 249. The Court reasoned that police officers acting in reliance upon binding appellate precedent should not be penalized for appellate judge error. Id. at 241.

The State correctly notes that this Court has not previously decided whether to adopt a good-faith exception to the exclusionary rule that applies to violations of article I, section 7 of the Tennessee Constitution. See State v. Carter, 16 S.W.3d 762, 768 n.8 (Tenn. 2000) (declining to address the issue until it was "squarely presented").[20] The State urges us to adopt the good-faith exception articulated in Davis[21] and points out, correctly, that courts in several other jurisdictions have adopted this good-faith exception

---

[20] We note that the General Assembly enacted a statute in 2011 entitled "Exclusionary Rule Reform Act." Tenn. Code Ann. § 40-6-108 (2012). This statute applies to "any evidence that is seized as a result of executing a search warrant." Id. § 40-6-108(a). Thus, the statute is not implicated in this appeal involving only a warrantless search.

[21] The State also advocated for adoption of the good-faith exception recognized in Krull, but we need not address this good-faith exception because we have not here found it necessary to determine the constitutionality of the implied consent statute. The Court of Criminal Appeals urged us to adopt the Krull exception if the implied consent law were held unconstitutional because it authorized or mandated warrantless blood draws. As already noted, however, another Panel of the Court of Criminal Appeals has held that the implied consent law does not authorize or mandate warrantless blood draws and upheld the statute's constitutionality. Wells, 2014 WL 4977356, at *13. We need not and do not decide that issue in this appeal; thus, we need not and do not adopt or reject the Krull good-faith exception.

and that it has been applied to prevent the exclusion of evidence obtained from warrantless blood draws conducted prior to McNeely.[22]

Having the issue now "squarely presented," we adopt as an exception to the state exclusionary rule the good-faith exception described in Davis. As already noted, this Court has long recognized that article I, section 7 is identical in intent and purpose to the Fourth Amendment. McCormick, 494 S.W.3d at 683-84. Additionally, this Court relied upon the United States Supreme Court's decision in Weeks when adopting the exclusionary rule as a remedy for violations of article I, section 7. Hughes, 238 S.W. at 594. Furthermore, like the federal exclusionary rule, the purpose of the state exclusionary rule is to deter police misconduct by excluding evidence obtained "by means prohibited by the Constitution." Id.; see also Hampton, 252 S.W. at 1009. The deterrence purpose of the exclusionary rule is not served by excluding evidence that was obtained by means authorized by binding judicial precedent that was overruled only *after* the evidence was obtained.[23] As the Davis Court stated, excluding evidence obtained under these circumstances would merely deter conscientious police work. Finally, we discern no "textual, historical, or other basis" on which to part company with the United States Supreme Court on this issue. State v. Watkins, 362 S.W.3d 530, 555 (Tenn. 2012) (interpreting the Double Jeopardy Clause of the Tennessee Constitution (article I, section 10) the same as the Double Jeopardy Clause of the Fifth Amendment). Nor does the adoption of the Davis good-faith exception require us to overrule "'a settled development of state constitutional law.'" State v. Vineyard, 958 S.W.2d 730, 733-34 (Tenn. 1997) (quoting Jacumin, 778 S.W.2d at 435-36). To the contrary, we have already recognized and applied other doctrines that are in effect exceptions to the exclusionary rule. See State v. Carter, 160 S.W.3d 526, 532-33 (Tenn. 2005) (applying the independent source doctrine and concluding that the exclusionary rule did not require suppression of the illegally seized evidence); Huddleston, 924 S.W.2d at 674-75 (applying the attenuation

---

[22] See Hinkle v. State, 86 So. 3d 441, 453 (Ala. Crim. App. 2011); People v. Harris, 184 Cal. Rptr. 3d 198, 225 (Cal. Ct. App. 2015) (applying the Davis good-faith exception to a warrantless blood draw); People v. Barry, 349 P.3d 1139, 1152 (Colo. Ct. App. 2015) (applying the Davis good-faith exception to a warrantless blood draw); Smallwood v. State, 113 So. 3d 724, 739 (Fla. 2013); People v. LeFlore, 32 N.E.3d 1043, 1050 (Ill. 2015); Parker v. Commonwealth, 440 S.W.3d 381, 387 (Ky. 2014); Kelly v. State, 82 A.3d 205, 215 (Md. 2013); People v. Mungo, 813 N.W.2d 796, 804-05 (Mich. App. 2012); State v. Lindquist, 869 N.W.2d 863, 871 (Minn. 2015) (applying the Davis good-faith exception to a warrantless blood draw); State v. Johnson, 354 S.W.3d 627, 630 (Mo. 2011); State v. Edwards, 853 N.W.2d 246, 254 (S.D. 2014) (applying the Davis good-faith exception to a warrantless blood draw); State v. Foster, 856 N.W.2d 847, 860-61 (Wis. 2014) (applying the Davis good-faith exception to a warrantless blood draw); State v. Oberst, 847 N.W.2d 892, 894-95 (Wis. Ct. App. 2014).

[23] For this reason, the dissent's assertion that our adoption of the Davis good-faith exception allows "a police officer to violate a citizen's constitutional rights with no consequences" is simply incorrect. The Davis good-faith exception applies only if the police action is consistent with governing law that is only subsequently overruled or modified.

doctrine and holding that the exclusionary rule does not require suppression of a confession obtained during a period of unlawful detention so long as the confession was sufficiently an act of free will to purge the taint of the illegality). Accordingly, we adopt the good-faith exception articulated in Davis.

Like the Minnesota Supreme Court, however, we wish to "note the narrowness of our holding." State v. Lindquist, 869 N.W.2d 863, 876 (Minn. 2015). We adopt only the Davis good-faith exception, which "represents a small fragment of federal good-faith jurisprudence." Id. Furthermore, the Davis good-faith exception we adopt applies only when the law enforcement officers' action is in objectively reasonable good faith reliance on "binding appellate precedent" that "specifically *authorizes* a particular police practice." Davis, 564 U.S. at 241. Persuasive precedent from other jurisdictions is not a sufficient basis for applying the Davis good-faith exception. Lindquist, 869 N.W.2d at 876. Nor does the Davis good-faith exception permit law enforcement officers to "extend the law to areas in which no precedent exists or the law is unsettled." Id. at 876-77 (internal quotation marks omitted) (quoting Davis, 564 U.S. at 250-51 (Sotomayor, J., concurring in the judgment)). Our holding today merely reflects the reality that the exclusionary rule does not serve its central purpose of deterring police misconduct "when applied to evidence obtained during a search conducted in reasonable reliance on binding precedent." Id. at 877. We need not and do not here decide whether to embrace any of the other good-faith exceptions to the exclusionary rule the Supreme Court has adopted. Id. Like the Kentucky Supreme Court, which also adopted but narrowly defined the Davis good-faith exception, we view our decision as adequately preserving "the protections provided by our state and federal constitutions while not penalizing police officers for performing their duties conscientiously and in good-faith." Parker v. Commonwealth, 440 S.W.3d 381, 387 (Ky. 2014). As the Kentucky Supreme Court declared, "[l]aw enforcement officers are the vanguard of our legal system." Id.

Finally, having adopted the Davis good-faith exception, we agree with the State that it applies here. Prior to McNeely, no warrant was required for a blood draw in drunk driving cases because Tennessee courts had interpreted Schmerber as establishing a broad categorical rule that the natural dissipation of alcohol within the bloodstream presents an exigent circumstance, justifying a warrantless blood draw in every drunk driving case. See, e.g., Humphreys, 70 S.W.3d at 761. As a result, even though Deputy Strzelecki believed the defendant had actually consented to the blood draw, his action in obtaining her blood without a warrant was in objectively reasonable good-faith reliance on binding precedent.[24] Under these circumstances, we conclude that the good-faith exception

---

[24] The dissent suggests that applying the Davis good-faith exception here is not proper because the United States Supreme Court did not apply it to the defendant in McNeely and because a Texas court refused to apply it. See Aviles v. State, 443 S.W.3d 291 (Tex. Ct. App. 2014). The dissent fails to recognize that the McNeely Court was not asked to apply the Davis exception. Indeed, the McNeely Court considered only the narrow issue of whether the natural dissipation of alcohol in the blood

applies, and the exclusionary rule does not require suppression of the evidence derived from the testing of the defendant's blood.

In so holding, we reject the defendant's final argument that Tennessee Rule of Criminal Procedure 41(g) provides her greater protection because it requires suppression of evidence derived from "[a] search or seizure [that] was made illegally without a search warrant . . . or in any other way in violation of the constitutional protection against unreasonable searches and seizures." Tenn. R. Crim. P. 41(g)(1). As already explained, the exclusionary rule is a judicially crafted remedy for constitutional violations. As a result, this Court has both the authority and the responsibility to decide whether the <u>Davis</u> good-faith exception, or any other exception, should be adopted. <u>Hodge v. Craig</u>, 382 S.W.3d 325, 337 (Tenn. 2012) ("[I]t is now beyond reasoned argument that this Court has the power to develop and adapt common law principles and their application."). Any holding that Rule 41(g), a procedural rule promulgated by this Court, can divest this Court of such authority would be peculiar indeed, because "[o]nly the [Tennessee] Supreme Court has the inherent power to promulgate rules governing the practice and procedure of the courts of this [S]tate." <u>State v. Mallard</u>, 40 S.W.3d 473, 480-81 (Tenn. 2001) (internal citations omitted). Rule 41(g) does not explicitly purport to divest this Court of such authority, and reading Rule 41(g) in the manner the defendant suggests simply is not reasonable. <u>See</u> <u>Fletcher v. State</u>, 951 S.W.2d 378, 382 (Tenn. 1997) ("To conclude that the Legislature, by its silence, intended to divest this Court of jurisdiction to review decisions denying motions to reopen is not reasonable."). To the contrary, the defendant's argument has already been implicitly rejected by prior decisions of this Court refusing to apply the exclusionary rule in other cases where evidence was obtained in violaton of the constitutional protections against unreasonable searches and seizures. <u>See, e.g.</u>, <u>Carter</u>, 160 S.W.3d at 532 (adopting the independent source doctrine); <u>Huddleston</u>, 924 S.W.2d at 674-75 (adopting the attenuation doctrine).
.

_____

constituted "a per se exigency that justifie[d] an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." <u>McNeely</u>, 133 S. Ct. at 1556; <u>see also</u> <u>id.</u> at 1568 ("Having rejected the sole argument present to us challenging the Missouri Supreme Court's decision, we affirm its judgment."). Furthermore, "[t]he Texas exclusionary rule is broader in scope and provides more protection to a suspect than its federal counterpart. Even if evidence is admissible as an exception to the federal rule, it may, nonetheless, still be subject to exclusion" under Texas law. <u>State v. Molden</u>, 484 S.W.3d 602, 609 (Tex. App. 2016). Texas courts have declined to adopt the <u>Davis</u> good-faith exception, finding it inconsistent with the Texas statutory exclusionary rule. <u>McClintock v. State</u>, 480 S.W.3d 734, 742-43 (Tex. App. 2015). As explained herein, Tennessee's exclusionary rule has developed coextensively with its federal counterpart, making adoption and application of the <u>Davis</u> good-faith exception in this case consistent with Tennessee law.

## IV. Conclusion

Accordingly, for the reasons explained herein, we conclude that Deputy Strzelecki had probable cause to believe that the defendant was driving while intoxicated at the time of the accident; thus the implied consent statute was triggered. We decline to decide in this appeal whether statutory implied consent satisfies the consent exception to the warrant requirement, because even assuming the warrantless blood draw violated the Fourth Amendment and article I, section 7, the exclusionary rule does not apply. Rather, we adopt the good-faith exception to the exclusionary rule as articulated in <u>Davis</u> and hold that this exception applies here. Accordingly, we affirm the judgment of the Court of Criminal Appeals on the separate grounds stated and remand this matter to the trial court for further proceedings consistent with this decision. Costs of this appeal are taxed to the State of Tennessee.

 

_____

CORNELIA A. CLARK, JUSTICE