# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 1, 2015 Session
### Remanded by the Supreme Court, March 8, 2017

## STATE OF TENNESSEE v. HELKIE NATHAN CARTER

### Appeal from the Criminal Court for Davidson County
### No. 2013-C-2372     Mark J. Fishburn, Judge

_____

### No. M2015-00280-CCA-R9-CD – Filed April 5, 2017

_____

Helkie Nathan Carter ("the Defendant") was indicted for the following counts: (1) driving under the influence ("DUI")—third offense; (2) driving with a blood alcohol concentration ("BAC") of .08 or more ("DUI per se")—third offense; (3) violation of the habitual motor vehicle offender statute; and (4) driving on a revoked license.  The Defendant's motion to suppress evidence obtained during a mandatory blood draw was granted by the trial court.  The State sought and was granted permission to appeal, arguing that the Defendant gave both actual and implied consent to the blood draw and that, if the good-faith exception is adopted in Tennessee, it should apply to this case. Upon review, we concluded that the Defendant's actual consent was not freely and voluntarily given; that Tennessee's implied consent law did not, by itself, operate as an exception to the warrant requirement; and that the Tennessee Supreme Court had yet to recognize a good-faith exception to the exclusionary rule and it was not the role of this court to do so.  *State v. Helkie Nathan Carter*, No. M2015-00280-CCA-R9-CD, 2016 WL 3044216, at *1 (Tenn. Crim. App. May 20, 2016).  Accordingly, we affirmed the trial court's granting of the Defendant's motion to suppress.  *Id.*  On March 8, 2017, the Tennessee Supreme Court granted the State's application for permission to appeal and remanded the case to this court for reconsideration in light of the supreme court's recent opinion in *State v. Reynolds*, 504 S.W.3d 283 (Tenn. 2016).  Upon reconsideration in light of *Reynolds*, we conclude that the good-faith exception to exclusionary rule applies in this case and that suppression of evidence derived from the testing of the Defendant's blood was not required.  Accordingly, the judgment of the trial court suppressing the results of the warrantless blood draw is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court Reversed and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Glenn Funk, District Attorney General; and Matthew Gilbert, Assistant District Attorney General, for the appellant, State of Tennessee.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant District Public Defender (on appeal); Jared Mollenkof, Assistant District Public Defender (at hearing), Nashville, Tennessee, for the appellee, Helkie Nathan Carter.

**OPINION ON REMAND**

**I. Factual and Procedural Background**

On February 1, 2013, the Defendant was arrested for DUI, and his blood was drawn for analysis. The Defendant filed a "Motion and Memorandum of Law to Suppress the Test Results Gained from the Illegal Blood Draw Performed on Helkie Carter" ("the Motion to Suppress"), claiming that his consent was not voluntarily given and the blood draw violated his Fourth Amendment right against unreasonable searches and seizures. The State filed several responses to the Motion to Suppress arguing that the Defendant had given actual and implied consent to the blood draw and that, even if consent were not given, the good-faith exception would apply to this case.

At the hearing on the Motion to Suppress, Officer Jonathan Jones testified that he observed a driver, later identified as the Defendant, make a "rolling stop" at a stop sign around 10:00 p.m. on the date of the offense. Officer Jones activated his blue lights and pursued the vehicle. Because the Defendant did not appear to have noticed the patrol car's blue lights, Officer Jones activated his siren in order to get the Defendant's attention, but the Defendant did not immediately pull over. Two other patrol cars joined in the pursuit before the Defendant stopped his vehicle. In total, Officer Jones pursued the Defendant's vehicle for ten to twelve blocks, or about a quarter of a mile, and the pursuit lasted approximately one minute. Officer Jones thought that the Defendant may not have pulled over immediately either because he was intoxicated or because he was trying to hide a weapon in his vehicle. Officer Jones believed that all three patrol cars were positioned behind the Defendant's when he stopped.

Officer Jones and the two other officers at the scene initiated a "high-risk takedown" by exiting their patrol cars with their guns drawn and ordering the Defendant to exit his vehicle. Officer Jones observed the Defendant rapidly "sling" his car door and then "kind of use the car door to climb out of the vehicle." Officer Jones then handcuffed the Defendant while the other two officers "held cover." Officer Jones stated that the Defendant smelled of alcohol, his eyes were "red, watery, bloodshot," his speech was "slightly slurred," and he was unsteady on his feet. Also, Officer Jones thought the Defendant had been at a party or a club because his clothes were in disarray and he was wearing a necklace which displayed a picture of the Defendant wearing the same clothes he had on during the traffic stop. Officer Jones administered a horizontal gaze nystagmus test and, based on the Defendant's performance, determined that a DUI officer should be called to the scene. At some point during this interaction, the handcuffs were removed. Officer Jones also searched the Defendant's driving record and found that he was a habitual motor vehicle offender. Officer Jones also noted that the Defendant ultimately stopped his car in front of his own house.

Officer Jonathan Frost testified that he assisted Officer Jones in the Defendant's DUI stop. Officer Frost noted that, once the Defendant stopped, all three officers on the scene had their guns aimed at the Defendant. The Defendant crawled out of the car, using the door to support himself, and the officers saw that the Defendant did not have anything in his hands. Officer Frost did not interact directly with the Defendant, but he recalled that the Defendant's speech was slurred and that the Defendant said he had just come from a club. Officer Frost stated that the Defendant seemed confused.

Sergeant Justin Pachciarz testified that he was the DUI officer called to the scene. Sergeant Pachciarz detected the odor from an alcoholic beverage on the Defendant's breath. When asked if he had been drinking, the Defendant responded that he either had two Bud Light beers or two sips of beer; Sergeant Pachciarz could not recall the exact amount without looking at his report. Sergeant Pachciarz administered the horizontal gaze nystagmus, the nine-step walk-and-turn, and the one-leg stand tests. The Defendant exhibited six out of eight indicators of intoxication during the field sobriety test, and Sergeant Pachciarz had to stop the one-leg stand half-way through the test because the Defendant could not finish the task. Based on the totality of the circumstances, Sergeant Pachciarz placed the Defendant under arrest for driving under the influence. Once the Defendant was inside Sergeant Pachciarz's patrol car, the sergeant recited the *Miranda* warnings and read the implied consent form to the Defendant. Sergeant Pachciarz also informed the Defendant that, because he had a prior DUI conviction, the blood draw was mandatory. Sergeant Pachciarz also admitted that he told the Defendant that, if he refused to give a blood sample, officers would have to hold him down in order to complete the blood draw. The Defendant consented to the blood draw at 10:39 p.m., and he signed the implied consent form once he had been transported to the hospital. The Defendant's blood was drawn at 11:11 p.m., and results from the test revealed that the

Defendant's blood alcohol content ("BAC") was .24. Sergeant Pachciarz recalled that the Defendant was cooperative the entire time.

Sergeant Pachciarz stated that he did not try to obtain a search warrant because he did not believe he needed one because the Defendant had a prior DUI. In the following exchange, he also explained that he did not believe he could obtain a search warrant because the Defendant was arrested prior to the release of *Missouri v. McNeely*, __ U.S. __, 133 S.Ct. 1552 (2013):

> Q: Were you aware that [obtaining a warrant] was something you could do at the time?
>
> A: No.
>
> Q: And had you received any sort of training through the police department or any notification that you could now go to night commissioners rather than simply judges for search warrants?
>
> A: Well, that changed when this law changed, but this time I don't believe the law had changed, we could.

Sergeant Harold Burke testified that, as a DUI sergeant, his role was to review paperwork, maintain training for the police department, teach new recruits about procedures, and ensure that officers are kept up to date on changes to the DUI laws. According to Sergeant Burke, once the police had probable cause to arrest a person, they would then read the implied consent form verbatim, which stated that a blood test was mandatory if the defendant had a prior DUI conviction. If a defendant agreed to submit to the blood test, they were transported to the hospital. If a defendant with a prior DUI conviction refused, police would remind the defendant what the law was. If a defendant refused a second time, a DUI supervisor would have been called to the scene, and the supervisor would explain that "it wasn't a decision that they could refuse and explain once again that if they did refuse that they're going to lose their driver's license[.]" Sergeant Burke also stated that he would inform defendants that "'the State mandates that we draw your blood and in order to draw—we don't have a choice, we have to draw your blood. If that means that we have to physically restrain you to draw your blood, that's what we'll have to do[.]'" Sergeant Burke testified:

> Before *McNeely* we did not do search warrants in DUI cases, it was considered an exigent circumstance because there was, at that time night court commissioners could not sign a search warrant, so typically DUI's take place late at night, in order to get a judge, you'd have to wake a judge up, find a judge that would be willing to come and listen to your probable cause and sign the search warrant, and that could take two to three hours.

Sergeant Burke explained that what was being taught in "the Academy" at the time of the Defendant's arrest was that

> The body processes over a period of time, the alcohol level in your blood would dissipate, it could rise, but generally it's dissipating, and the longer you wait, the long lower the blood level is gonna be, so potentially, I mean, evidence is being lost, in essence, because you're waiting to get the search warrant.

However, Sergeant Burke explained that he would only warn a defendant about physical restraint after he had consulted with the field captain and obtained the field captain's advice on how to proceed. Sergeant Burke reiterated that comments about holding the defendant down only came after the defendant had been read the implied consent law and had refused to give consent.

To Sergeant Burke's knowledge, officers did not obtain search warrants for a blood draw prior to the decision being issued in *McNeely*. After *McNeely* was issued, officers stopped taking warrantless mandatory blood samples when the defendant refused. Instead, officers either sought a search warrant for the blood or the defendant was simply charged with violation of the implied consent law. Sergeant Burke noted that, prior to *McNeely*, Davidson County officers thought that the natural dissipation of the BAC over time constituted an exigent circumstance. Additionally, Sergeant Burke believed that, at the time of the Defendant's arrest, Davidson County night commissioners could not sign search warrants and that any search warrant sought would have to be signed by a judge. However, an order from Davidson County General Sessions Judge Mondelli, which is included in this record on appeal, states that, effective September 10, 2012, over four months before the Defendant's arrest, Davidson County night court commissioners could sign search warrants.

The Defendant testified that he stopped his car in front of his house and that one police car pulled in front of his car while two others stopped behind his car. The officers exited their patrol cars, drew their guns on the Defendant, and ordered him to exit his vehicle. The Defendant exited his car and held his hands in the air. About fifteen to twenty minutes later, the Defendant was placed into the back of Sergeant Pachciarz's patrol car. At that point, Sergeant Pachciarz informed the Defendant that, because he had a prior DUI conviction, it was mandatory for the Defendant to submit to a blood test and that officers would hold him down in order to get the blood sample. The Defendant consented to the blood draw. The Defendant said he did not think that he had the right to refuse the blood test and explained that he did not say anything when he was asked to sign the implied consent form because he did not want to argue with Sergeant Pachciarz.

- 5 -

In a memorandum opinion, the trial court relied on *State v. James Dean Wells*, No. M2013-01145-CCA-R9-CD, 2014 WL 4977356 (Tenn. Crim. App. Oct. 6, 2014), to conclude that Tennessee Code Annotated section 55-1-406(f)(2) does not create a per se exception to the warrant requirement and that officers are required to seek a warrant for mandatory blood draws absent an exception to the Fourth Amendment, such as voluntary consent or exigent circumstances. Further, the trial court found that the Defendant's consent was not voluntarily given, stating:

> . . . The Defendant's freewill was overborne and, therefore, the consent given was invalid. The Defendant was boxed in by three patrol vehicles after a relatively short pursuit for rolling through a stop sign. Although the Defendant did not immediately respond to the officers' emergency equipment, it cannot reasonably be said that he was attempting to elude the police since his speed never exceeded [twenty] miles per hour.[1] As he pulled in front of his home, one officer abruptly pulled in front of the Defendant's vehicle so that the Defendant's vehicle was completely boxed in.
>
> The officers then exited their vehicles and approached the Defendant's vehicle with their guns drawn and fixed on the Defendant. The whole time they were commanding him to get on the ground face down. For reasons that are totally unclear to the court, a fourth officer arrived on the scene to assist with the apprehension of [the Defendant]. Once seized in this extraordinary and unnecessary show of police authority, the officers quickly concluded that the [D]efendant was under the influence of an intoxicant and placed him under arrest. In an apparent effort to underscore the implied consent advisory, the officers informed the Defendant in no uncertain terms that they were going to take a blood sample from him with or without his consent and that they would forcefully hold down the Defendant to take the sample.
>
> The Defendant was then taken to the hospital to have the blood draw taken. It was at this point that he signed the consent form and a draw of the Defendant's blood was taken. The Defendant testified that he did not believe he had a choice other than to give the blood draw. By his understanding of the situation he could either submit to the blood test and cooperate or refuse and then be pinned down or forcefully constrained while they injected a needle into his vein. The Defendant, having been subjected to an inexplicable display of raw force and fire power,

---

[1] The trial court appears to reach a conclusion that the Defendant's speed never exceeded twenty miles per hour based on Officer Jones's testimony that the Defendant travelled a quarter of a mile in the span of one minute.

- 6 -

understandably wanted to avoid any possible confrontation and, therefore, acquiesced to the officers' blood draw demand.

> Based on the totality of the circumstances, the Defendant's will was overborne by the investigating officers. The Defendant was met with a high degree of hostility even though he was generally cooperative. As such, the Defendant's consent to search was not freely and voluntarily given when he was confronted by the implied consent advisory at the hospital.

Additionally, the trial court took judicial notice of the fact that the hospital where the Defendant's blood was drawn was a ten-minute drive from the Davidson County Criminal Justice Center. The trial court held that the evidence collected during the blood draw must be suppressed and dismissed the DUI per se charge. The State sought and was granted permission from the trial court for a Rule 9 interlocutory appeal to this court. This court granted the State's application for interlocutory appeal.

## II. Analysis

On appeal, the State argues that the evidence should not have been suppressed because the Defendant gave actual consent to his blood being drawn and such consent was freely and voluntarily given. Additionally, the State contends that the Defendant gave his implied consent to a blood draw by operating a vehicle on the roads in Tennessee and that he did not expressly revoke that consent. Moreover, the State claims that, if the good-faith exception to the warrant requirement is adopted in Tennessee, it should apply to this case because the officers reasonably believed, based on existing statutory and case law, that they did not need to obtain a warrant in order to draw the Defendant's blood. The Defendant argues that the trial court correctly found that the Defendant did not give actual consent to the blood draw. Regarding the implied consent statute, the Defendant contends that "the 'consent' involved in 'implied consent' is not constitutionally-valid consent to search, but rather a consent to certain consequences should permission to search be withheld." Finally, the Defendant notes that Tennessee has not adopted a good-faith exception to the warrant requirement and asserts that, even if the good-faith exception is adopted in Tennessee, it does not apply to this case because the Defendant's consent was not constitutionally valid.

### A. Standard of Review

A trial court's factual findings on a motion to suppress are binding on appeal unless the evidence preponderates against them. *State v. Binnette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility

of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn therefrom. *Id.* However, we review the trial court's application of the law to the facts de novo with no presumption of correctness. *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

## *B. Consent*

Both the United States and Tennessee Constitutions guarantee the right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV; Tenn. Const. Art. I, § 7. A blood draw conducted by law enforcement for use as evidence in a criminal investigation constitutes a search subject to constitutional protection. *McNeely*, 133 S.Ct. at 1558; *Schmerber v. California*, 384 U.S. 757, 769-70 (1966). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)). Consent is one of the recognized exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

### i. Actual Consent

In order to be valid, actual consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Ingram*, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting *State v. Berrios*, 235 S.W.3d 99, 109 (Tenn. 2007)). "Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." *Berrios*, 235 S.W.3d at 109. "The pertinent question is . . . whether the [individual's] act of consent is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." *State v. Cox*, 171 S.W.3d 174, 185 (Tenn. 2005) (citing *Schneckloth*, 412 U.S. at 225-26). Factors to be considered when evaluating the voluntariness of consent include the time and place of the encounter; whether the encounter was in a public or secluded place; the number of officers present; the degree of hostility; whether weapons were displayed; whether consent was requested; and whether the consenter initiated contact with the police. *Id.* The State bears the burden of proving that the consent was freely and voluntarily given. *State v. Blackwood*, 713 S.W.2d 677, 680 (Tenn. Crim. App. 1986).

In this case, the trial court found that the Defendant's freewill was overborne, rendering his consent invalid. The evidence showed that the Defendant was pulled over by three police officers and that officers ordered the Defendant out of his car at gun point and placed him in handcuffs. When Sergeant Pachciarz arrived on the scene, he conducted a field sobriety test and then placed the Defendant under arrest. At that point, Sergeant Pachciarz read the implied consent form to the Defendant and informed the Defendant, in no uncertain terms, that officers would hold the Defendant down and take a sample of his blood by force if the Defendant refused to consent to the blood draw. The Defendant testified that he felt he had no other choice than to give his consent. As such, the evidence does not preponderate against the trial court's finding that the Defendant did not freely and voluntarily give his actual consent.

## ii. Implied Consent

Tennessee Code Annotated section 55-10-406 states in pertinent part:

(a)(1) Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests. However, no such test or tests may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having reasonable grounds to believe the person was driving while under the influence of alcohol, a drug, any other intoxicant or any combination of alcohol, drugs, or other intoxicants as prohibited by § 55-10-401, or was violating § 39-13-106, § 39-13-213(a)(2) or § 39-13-218.

Tenn. Code Ann. § 55-10-406(a)(1) (2012). Pursuant to the statute, the police may only test a defendant's blood when they have "reasonable grounds to believe" that the person was driving while under the influence or had committed vehicular assault, vehicular homicide, or aggravated vehicular assault. *Id.* "Reasonable grounds" has been interpreted to mean probable cause. *State v. Bowery*, 189 S.W.3d 240, 248 (Tenn. Crim. App. 2004).

The statute also requires that, prior to requesting a blood sample, officers must advise the defendant that refusal to submit to the test will result in the suspension of the defendant's driver's license as well as other possible consequences. Tenn. Code Ann. § 55-10-406(a)(3) (2012). If the defendant refuses to give consent, he will be charged with violation of the implied consent law. Tenn. Code Ann. § 55-10-406(a)(4)(A) (2012).

However, in certain circumstances, a blood draw is mandatory. Tennessee Code Annotated section 55-10-406(f)(2)[2] states:

> If a law enforcement officer has probable cause to believe that the driver of a motor vehicle has committed a violation of § 39-13-213(a)(2), § 39-13-218 or § 55-10-401 and has been previously convicted of § 39-13-213(a)(2), § 39-13-218 or § 55-10-401 the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood. The test shall be performed in accordance with the procedure set forth in this section and shall be performed regardless of whether the driver does or does not consent to the test.

The United States Supreme Court has cautioned against per se exceptions to the Fourth Amendment warrant requirement. In *Missouri v. McNeely*, __ U.S. __, 133 S.Ct. 1552 (2013), the Supreme Court clarified that the natural dissipation of alcohol in the blood does not create a per se exigent circumstance that would allow the police to take a blood sample without a warrant. *McNeely*, 133 S.Ct. at 1561. Instead, the Fourth Amendment requires officers to obtain a search warrant when, based on the totality of the circumstances, obtaining a warrant will not "significantly undermin[e] the efficacy of the search." *Id.* at 1561, 1563. After *McNeely* was released, the Supreme Court vacated the Texas Court of Appeals' decision in *Aviles v. Texas*, 385 S.W.3d 110 (Tex. App. 2012), and remanded the case for further consideration of Texas's mandatory blood draw statute in light of *McNeely*. *Aviles v. Texas*, 134 S.Ct. 902, 902 (2014). On remand, the Texas Court of Appeals concluded that Texas's implied consent and mandatory blood draw statutes created a "categorical or per se" exception to the warrant requirement in violation of *McNeely*. *Aviles v. Texas*, 443 S.W.3d 291, 294 (Tex. App. 2014). Because the implied consent and mandatory blood draw statutes were not permissible exceptions to the warrant requirement, the court held that the warrantless blood draw violated the Fourth Amendment. *Id.*

Similarly, when examining Tennessee's implied consent statute this court has previously stated, "[A] conclusion that the legislature intended to create an exception to the state and federal constitutional warrant requirements would require us to declare [the implied consent] statute unconstitutional." *State v. Charles A. Kennedy*, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *12 (Tenn. Crim. App. Oct. 3, 2014); *see also Aviles*, 443 S.W.3d at 294. Moreover, this court presumes that the General Assembly was aware that it could not circumvent Fourth Amendment protections by way of legislative enactment. *Charles A. Kennedy*, 2014 WL 4953586, at *12. The statute is silent about whether a warrant is required for a mandatory blood draw pursuant to section

---

[2]Tennessee Code Annotated section 55-10-406(f)(2) has since been recodified as Tennessee Code Annotated section 55-10-406(d)(5)(B).

55-10-406(f), but this court has concluded that the statute was not intended "to operate as a blanket exception to the warrant requirement." *Id.*; *see also James Dean Wells*, 2014 WL 4977356, at *13. Instead, "[t]he 'consent' inherent in the implied consent law is generally consent to *either* submit to testing or to accept the consequences of a refusal of testing, including a loss of license." *James Dean Wells*, 2014 WL 4977356, at *13 (emphasis added). In other words, the implied consent statute serves as a tool the State may use to persuade a defendant to submit to a blood test, but it does not, alone, create consent for the purposes of the Fourth Amendment. As this court has stated:

> While the State may attempt to persuade the accused to submit to a search by providing consequences for a failure to submit to a test ordered upon probable cause, we hold that the privilege of driving does not alone create consent for a forcible blood draw. Given the gravity of the intrusion into privacy inherent in a forcible blood draw, we conclude that such a search is not reasonable unless performed pursuant to a warrant or an exception to the warrant requirement. *The implied consent law does not, in itself, create such an exception.*

*Id.* (emphasis added). *But see State v. Corrin Kathleen Reynolds*, No. E2013-02309-CCA-R9-CD, 2014 WL 5840567, at *10 (Tenn. Crim. App. Nov. 12, 2014) ("[A]nyone who exercises the privilege of operating a motor vehicle 'is deemed to have given consent to a test or test for the purpose of determine the alcoholic content of that person's blood.'"), *aff'd State v. Reynolds*, 504 S.W.3d 283, 288 (Tenn. 2016)[3]; *State v. Darryl Alan Walker*, No. E2013-01914-CCA-R3-CD, 2014 WL 3888250, at *6 (Tenn. Crim. App. Aug. 8, 2014) ("[C]onsent occurs at the point that a driver undertakes the privilege of operating a motor vehicle in the State of Tennessee, not at the point the implied consent form is read[.]"); *State v. Humphreys*, 70 S.W.3d 752, 761 (Tenn. Crim. App. 2001), *perm. app. denied* (Tenn. Dec. 31, 2001) ("[A]nyone who exercises the privilege of operating a motor vehicle in this state has consented in advance to submit to a breath alcohol test."). Therefore, in order for a mandatory blood draw to comply with the Fourth Amendment, "it must be supported by a warrant issued by an independent magistrate finding probable cause or by exigent circumstances, voluntary [actual] consent, or some other exception to the warrant requirement." *James Dean Wells*, 2014 WL 4977356, at *13. The implied consent law does not satisfy the consent exception to the warrant requirement. *Id.*

---

[3]In *Reynolds*, the Tennessee Supreme Court declined to address whether Tennessee's implied consent statute satisfies the consent exception to the warrant requirement. *Reynolds*, 504 S.W.3d at 309.

*B. Good-Faith Exception and Reconsideration in Light of <u>Reynolds</u>*

Nevertheless, the State argues that if the good-faith exception to the exclusionary rule were adopted in Tennessee it would apply to this case. In our original opinion, we noted that the Tennessee Supreme Court had yet to recognize a good-faith exception to the exclusionary rule and concluded that it was not the role of this court to do so. *Helkie Nathan Carter*, 2016 WL 3044216, at \*7. However, following the release of this court's opinion, our supreme court decided *Reynolds*, in which it adopted the good-faith exception to the exclusionary rule articulated by the United States Supreme Court in *Davis v. United States*, 564 U.S. 229 (2011), that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Reynolds*, 504 S.W.3d at 312 (quoting *Davis*, 564 U.S. at 241) (internal quotation marks omitted). Applying the good-faith exception, the court in *Reynolds* held that evidence derived from the defendant's blood test did not need to be suppressed "because the warrantless blood draw was obtained in objectively reasonable good-faith reliance on binding precedent." *Id.* at 288. The court explained that, "[p]rior to *McNeely*, no warrant was required for a blood draw in drunk driving cases because Tennessee courts had interpreted *Schmerber* as establishing a broad categorical rule that the natural dissipation of alcohol within the bloodstream presents an exigent circumstance, justifying a warrantless blood draw in every drunk driving case." *Id.* at 314 (citing *Humphreys*, 70 S.W.3d at 761).

`       In this case, Sergeant Burke testified that it could take two to three hours to obtain a search warrant at time of the Defendant's arrest. He explained that before *McNeely,* night court commissioners were not allowed to sign search warrants. He also explained that most DUIs occurred late at night so that it would be necessary to find a judge that would be willing and available to meet the officers. The Defendant signed the implied consent form at after midnight. Sergeant Burke explained that police officers were taught in the Police Academy that blood alcohol dissipated over time and dissipation could be an exigent circumstance justifying a mandatory blood draw. At the time of the Defendant's arrest, this court had stated, "Based upon the fact that evidence of blood alcohol content begins to diminish shortly after drinking stops, a compulsory breath or blood test, taken with or without the consent of the donor, falls within the exigent circumstances exception to the warrant requirement." *Humphreys*, 70 S.W.3d 752, at 760-61.

Based on the reasoning in *Reynolds* and because the Defendant's arrest occurred before *McNeely*, we conclude that Sergeant Pachciarz obtained the Defendant's blood sample without a warrant in "objectively reasonable good-faith reliance on binding precedent," and as such, the exclusionary rule does not require suppression of the evidence in this case. *See id.*

### III. Conclusion

For the aforementioned reasons, the judgment of the trial court suppressing the results of the warrantless blood draw is reversed, and the case is remanded for further proceedings.

_____
ROBERT L. HOLLOWAY, JR., JUDGE