IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Remanded on April 26, 2017

**STATE OF TENNESSEE v. MICAH ALEXANDER CATES**

**Appeal from the Criminal Court for Carter County**
**No. 21779    Jon Kerry Blackwood, Judge**

_____

**No.  E2014-01322-CCA-R3-CD**
_____

The Tennessee Supreme Court has remanded this case for reconsideration in light of *State v. Reynolds*, 504 S.W.3d 283 (Tenn. 2016).  *See State v. Micah Alexander Cates*, No. E2014-01322-CCA-R3-CD, 2015 WL 5679825, at *1-6 (Tenn. Crim. App. Sept. 28, 2015), *perm. app. granted*, *case remanded* (Tenn. Nov. 16, 2016).  Relevant to the current remand, this court concluded in the previous appeal that a new trial was necessary because the warrantless blood draw was not justified by exigent circumstances and that the evidence obtained from the blood draw should have been suppressed.  Upon further review, we conclude that the good-faith exception to the exclusionary rule permitted the admission of the relevant evidence, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Steven R. Finney, Johnson City, Tennessee, for the appellant, Micah Alexander Cates.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Deputy Attorney General; Anthony Clark, District Attorney General; and Janet Hardin and Robin Ray, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from a single-vehicle crash on August 14, 2012, in which the Defendant was injured and his passenger, Tanner Perkins, was killed.  On appeal, this court summarized the facts of the case as follows:

## SUPPRESSION HEARING

Captain Greg Workman of the Elizabethton Police Department ("EPD") testified that on August 14, 2012, he received a dispatch at 1:47 a.m. to a single-car accident on Milligan Highway. He arrived at the scene within five minutes of the dispatch and found a white BMW "intertwined with a metal pole in the Milligan Grocery parking lot" and an individual, later determined to be the Defendant, lying outside of the driver's side door. Captain Workman observed another individual in the passenger seat of the car and attempted to make contact with the Defendant to determine the number of occupants in the car and their identities. The Defendant appeared to have an open fracture to his left leg and was "obviously in pain" and "confused." He was unable to recall the number of occupants in the car or the identity of the individual in the passenger seat. While assessing the scene, Captain Workman smelled an "odor of alcohol, but could[ not] determine whether or not it was coming from [the Defendant] or from the vehicle."

Because of his injuries, the Defendant was soon transported by ambulance to the Johnson City Medical Center ("JCMC"). Captain Workman testified that he "knew it was a possibility" that the Defendant was under the influence of alcohol at the time of the accident, and based on the totality of the circumstances, he believed that "exigent circumstances existed and [the police] needed to draw blood as soon as [the Defendant] got to the hospital." He explained, "[There was] a high impact collision to a fixed structure[,] . . . [and the Defendant] was lying in the roadway with an open fracture to his leg. We [were] concerned not only about the injuries that we observed externally, but [also] the internal injuries that he could have[.]" He directed an officer to follow the ambulance and obtain a blood sample from the Defendant.

On cross-examination, Captain Workman testified that he observed the Defendant for approximately 45 seconds to one minute while on the scene. He also stated that he had investigated three mandatory blood draw cases and had never sought a search warrant to draw the suspect's blood. He agreed, however, that he had drafted approximately 40 search warrants in his career and had taken 20 to 25 search warrants to a nearby judge's house "at all hours of the night." He further agreed that two judges lived within a few miles of the accident scene and were willing to receive officers at any hour of the night to sign search warrants. He acknowledged that the EPD has search warrant templates and that search warrants can be drafted

-2-

based on knowledge received from other officers. He also acknowledged that the officers on the scene had cell phones and radios but stated that there were no officers on duty at the police station at the time of the accident. He conceded that four of the 11 officers that responded to the scene had experience drafting search warrants.

On redirect examination, Captain Workman testified that to get a search warrant that evening, an officer would have had to return to the police station, draft a search warrant, contact the district attorney to have the warrant reviewed, and then contact a judge to have the warrant signed. He reiterated that "time was [of] the essence on this case" and stated that he needed all of the responding officers on the scene. When asked what exigencies existed in this case, Captain Workman stated,

> When I viewed the [Defendant] I viewed the injury to his leg. I knew that he was going to be transported to the hospital hot, which [means] emergency. I knew that he was going to be going into surgery and I didn't want anything else to be put into his system prior to us drawing that blood.

He agreed that he was also concerned about the natural dissipation of alcohol from the Defendant's system and the time it would take to get a search warrant before drawing his blood. He added that "if the accident [were] to happen tonight I would have done nothing different than what I did that particular night . . . [because] I felt exigent circumstances existed[.]"

EPD Officer Ryan Brackett arrived on the scene at approximately 2:50 a.m. where he observed a single-car accident that occurred when the car "failed to negotiate [a] curve and struck a pole" in the parking lot of Milligan Grocery. He described the accident as "horrific" and recalled that the motor was thrown approximately 40 feet from the car and the pole "intru[ded] into the vehicle" on the passenger's side to the rear seat. When Officer Brackett arrived on the scene, which was over an hour after the initial dispatch, the Defendant had already been transported to the hospital and the victim had been extricated from the car. On cross-examination, Officer Brackett testified that he had drafted search warrants in the past but had never drafted a search warrant for a mandatory blood draw. He agreed that the EPD had a "form" or "outline" for search warrants available and that he had a cell phone and radio in his car that evening. He also agreed that 11 officers responded to the scene that evening and that two officers

-3-

were sent to get blood samples from the Defendant and the victim, leaving nine officers on the scene to investigate.

EPD Officer Matt Sexton, who arrived within 10 minutes of the dispatch, described the scene as "a mess." He explained that there was "a large field of debris" and "parts of the vehicle [that] were thrown quite a distance from the actual crash scene." In addition to the responding police officers, the fire department and emergency medical services were also on the scene. Captain Workman directed Officer Sexton to follow the ambulance transporting the Defendant to the hospital to obtain a blood sample from him. He recalled that the Defendant was transported "hot," meaning that the ambulance used its emergency lights and audible signals during transport, and agreed that there was a "high sense of emergency and urgency." At the hospital, Officer Sexton directed a nurse to collect a sample of the Defendant's blood. He observed the Defendant lying on a gurney at the hospital but did not make contact with him and could not tell whether the Defendant was conscious or unconscious. Officer Sexton testified that the Defendant's blood was drawn at 2:30 a.m. On cross-examination, Officer Sexton testified that he was at the hospital approximately 20 minutes.

Lindsey Jones, a registered nurse-anesthetist working at JCMC on August 14, 2012, put the Defendant under anesthesia for surgery at approximately 7 a.m. that day. She testified that when she met the Defendant in the surgery holding unit, his chart indicated that he had been administered Versed, a benzodiazepine drug that causes amnesia. His chart also indicated that he was administered Zofran, Dilaudid, Ancef, and Gentamicin intravenously. In order to put the Defendant to sleep, Jones administered Propofol, Lidocaine, Syccinylcholine, Rocuroniun, and Fentanyl. Jones testified that of the drugs administered to the Defendant, Versed, Dilaudid, and Fentanyl would show up on a toxicology screen, but the other drugs would not show up on a screen. On cross-examination, Jones agreed that these drugs were administered to the Defendant while he was in the surgery holding unit around 7 a.m. and not while he was in the trauma unit when he first arrived at the hospital.

Agent Stephanie Dotson of the Tennessee Bureau of Investigation ("TBI") testified as an expert in forensic toxicology. She received a sample of the Defendant's blood from the EPD and performed an alcohol analysis on it to determine its blood alcohol content, the results of which she memorialized in a report that was introduced into evidence at the hearing.

-4-

When asked whether certain drugs, like benzodiazepine or Dilaudid, could impact a toxicology analysis, she responded, "[w]hen a drug screen is run[,] we can find benzodiazepine. We cannot find Dilaudid, so, it would not show up." She added that if a sample of blood were drawn "fairly recently" after the patient was administered a benzodiazepine drug, the toxicology analysis would not detect it yet.

Following the hearing, the trial court denied the Defendant's motion in an order on October 23, 2013. In finding exigent circumstances existed to justify the warrantless blood draw, the court made the following findings:

> This accident occurred late at night after the Elizabethton City Police Department had no officer on service at the police department. The collision[] occurred when the [D]efendant failed to negotiate a slight turn on Milligan [Highway]. The collision was violent and . . . [d]ebris was scattered throughout the scene. It was obvious to Captain Workman that the [D]efendant was seriously injured. The officer believed that the [D]efendant had internal injury and surgery might be immediate. The officer had no way to phone the [Police] Department to start the search warrant procedure. No officer on the scene had a laptop computer in order to use a template to print off a proposed search warrant. In order to obtain a search warrant, the officer would have to return to the Police Department. Once at the Department, he would be required to draft the search warrant and call an Assistant District Attorney to review the warrant. Then the officer would have to contact on[e] of the Judges for their signature. This process would have taken some time to complete. The officer knew that surgery was a distinct possibility and that surgery more than likely would require the injection of various chemicals into the [D]efendant's body that might compromise the integrity of a blood alcohol test or drug screen. Under these circumstances, the Court finds that there were exigent circumstances that justified taking of the blood sample.
>
> The Court finds that the fact that surgery was undertaken some five hours later or that the drug [D]ilau[d]in that was administered to the [D]efendant would not have affected the

-5-

[toxicology screen] is not material. The test of reasonableness is determined in the subjective thoughts of the officer at the time the decision was made to order the blood sample. Wherefore, the Court overrules the Motion to Suppress.

## TRIAL

**State's Proof.** Officer Matt Sexton's testimony at trial was largely consistent with his testimony from the suppression hearing. He described the scene as "the worst wreck [he had] ever seen" and recalled that the car was "nearly unrecognizable." Officer Sexton was sent to JCMC to obtain a sample of the Defendant's blood. He provided hospital staff with a TBI blood collection kit and waited outside of the curtain to the trauma bay while the nurse drew the Defendant's blood. After the nurse returned the blood sample, Officer Sexton returned to the scene of the accident and helped divert traffic and preserve the scene. On cross-examination, Officer Sexton testified that he had no "personal contact" with the Defendant and did not observe his injuries. He was informed that the Defendant had a leg injury but knew of no other injuries.

Captain Greg Workman likewise testified consistently with his testimony from the suppression hearing. He described the duties of the officers on the scene as follows:

> [F]irst off, we had to preserve that crime scene. This happened on Milligan Highway, so we had to divert traffic. So, that tied up at least three officers to divert traffic so we would have no other vehicles[] or individuals coming up on that scene. We had one that was responsible for photography of that scene. We also had individuals that were responsible for making the markings of the skid marks, the final rest of the vehicle, final rest of heavy objects of the vehicle that were dislodged from the impact. And also we had a scribe and then we had other individuals that were responsible for taking the measurements of that scene.

Based on his experience and observations at the scene, Captain Workman concluded that the Defendant may have been under the influence of alcohol, and he directed Officer Sexton to go to JCMC to obtain a sample of the Defendant's blood. On cross-examination, Captain

-6-

Workman agreed that he did not hire an expert to examine the car for other possible causes for the accident.

Officer Ryan Brackett also testified consistently with his testimony from the suppression hearing. At trial, he was qualified as an expert in traffic reconstruction and testified about the accident reconstruction in this case. He opined that the Defendant's car was traveling at least 91.3 miles per hour prior to braking, evidenced by the start of skid marks on Milligan Highway, and was traveling 75 to 85 miles per hour at the time of impact. On cross-examination, Officer Brackett stated that he conducted a background check on the car through Rick Hill Imports and the National Institute of Highway Safety and found no recall on a 2002 BMW. He agreed that he found the victim's cell phone at the scene and returned it to the victim's father. He did not search the phone because he did not have a search warrant or permission from the victim's family to do so and because he did not think it was relevant.

TBI Special Agent Stephanie Dotson testified as an expert in the field of forensic science. She analyzed the Defendant's blood sample in the present case and testified that his blood alcohol content was .14 grams percent. She recorded these findings in a report, which was introduced into evidence.

Dr. Ken Ferslew testified as an expert in forensic toxicology and reviewed the findings in the Defendant's case. In analyzing the Defendant's case, he was provided the crash report, the officers' notes, the Defendant's medical records, and the TBI toxicology reports of the Defendant's blood sample. He explained that based on the evidence he was provided, he was able to calculate a predicted blood alcohol content of .152 grams percent at the time of the crash. He noted that this percent would have been the highest possible concentration prior to the accident. Dr. Ferslew testified that such concentration levels of impairment often cause loss of inhibitions, euphoria, psychomotor impairment, ataxia, motor-incoordination, and an increase in personality. Dr. Ferslew testified that the Defendant was intoxicated at the time of the crash but acknowledged that he could not testify as to the extent of his impairment because no psychomotor evaluations, such as a field sobriety test, were performed on him. He stated, however, that regardless of the extent of the Defendant's impairment, his intoxication "would have contributed to his mis-operation of the vehicle."

**Defendant's Proof.** Wayne Pritchard, a Carter County Sheriff's Deputy, testified that he arrived on the scene two or three minutes before any EPD officers arrived and found the Defendant lying on the ground outside of the car. He asked the Defendant whether any other occupants were in the vehicle, and the Defendant informed him that there was another passenger.

Quinton Garrett, a friend of the Defendant and the victim, testified that he rode with the Defendant to the victim's apartment on the night of August 13, 2012. He testified that he did not see the Defendant consume any alcohol prior to arriving at the victim's apartment and that the Defendant did not bring any alcohol to the apartment. He observed the Defendant drink alcohol at the victim's apartment but did not know how much he drank. When asked about the state of the Defendant's sobriety, Garrett testified, "If I didn't see him [drink] I wouldn't think he had been drinking at all." Garrett recalled that the Defendant asked the victim if he wanted to ride with him to the store to buy cigarettes and the victim agreed.

The Defendant testified that he was 19 years old and a junior at East Tennessee State University at the time of the accident. He had known the victim since 5th or 6th grade, and the two were best friends. On August 13, 2012, the victim invited the Defendant and several other friends to his apartment to play a drinking game. The Defendant testified that he did not drink any alcohol prior to arriving at the victim's apartment and estimated that he consumed three alcoholic beverages while at the victim's apartment. After several hours, the group "decided that we needed more cigarettes if we were going to keep drinking." The Defendant believed that he was sober enough to drive to the store, and the victim agreed to ride with him. After purchasing a pack of cigarettes at the store, the Defendant and victim drove back towards the victim's apartment. The Defendant described the events as follows:

> I just remember lighting up a cigarette, pulling out of the [store] parking lot, roll[ing] the windows down. . . . [We took] the same route that we had taken to get there, the Milligan Highway. We . . . turned up the music, started speeding, . . . then we c[a]me to the straightaway.
>
> . . . .

[A]pproaching the turn I actually remember . . . everything was normal.  I go to just take the turn . . . [and] realize that . . . something was wrong.  My first reaction is just brakes 'cause I . . . was speeding and the recommended speed on that road is 40, 45 whatever. I was definitely above that, so, I hit the brakes.  Nothing – part of the brakes. Nothing from the steering.

The Defendant explained that when he turned the wheel, "nothing happen[ed]."  He testified that he had problems with the steering in his car prior to the accident and had it repaired in May 2012.

After the accident, the Defendant immediately yelled for the victim. He smelled "gas and other things" so he climbed out of the car.  When he tried to stand up to look for the victim, he realized his leg was broken.  He waved down a passing truck and told the two men to help the victim get out of the car and to call the police.  The Defendant was taken to the hospital for medical treatment and was told that the victim was killed in the accident the following morning.  On cross-examination, the Defendant denied that anyone else offered to drive to the store that night.  He agreed that he made the decision to drive to the store knowing that he was not fully sober and that he made a conscious decision to speed.

Jeff Gwinn, the owner and operator of Jeff's Paint and Body, testified that he repaired the Defendant's car in June 2012.  He recalled that he repaired, among other things, the right tie rod of the vehicle.  He agreed that the Defendant presented him a parts list from Rick Hill Imports detailing the parts and repairs he wanted and that most of the parts dealt with the suspension of the car.  He also agreed that not all of the parts and repairs on that list were completed.  On cross-examination, he explained that there is a difference in the quote estimate and the final bill because "I give a quote and then I go off of what we find when we get up in the air." He agreed that if he saw something on the car that was not repaired that he believed to be dangerous, he would have notified the owner.  With regard to the Defendant's car, he insisted that there was "nothing that was not repaired."  After returning the car to the Defendant, he was not contacted by the Defendant about any problems with the car.

**State's [Rebuttal] Proof.**  On rebuttal, the State called Hunter Kitchens, a friend of the Defendant and victim who was at the victim's apartment on the night of August 13, 2012.  He testified that he observed

the Defendant drinking alcohol at the victim's apartment that evening and that he offered to drive to get more cigarettes. The Defendant declined his offer and said he was "okay to drive." On cross-examination, Kitchens testified that the Defendant and the victim were "best friends . . . honestly more like brothers."

Following deliberations, the Defendant was convicted of vehicular homicide by intoxication. At the sentencing hearing, the trial court denied alternative sentencing and imposed the minimum sentence of eight years' confinement, to be served at 30 percent.

*Micah Alexander Cates*, 2015 WL 5679825, at *1-6 (footnotes omitted).

In its order granting the State's application for review pursuant to Tennessee Rule of Appellate Procedure 11, the supreme court stated that the case was remanded to this court for reconsideration in light of *Reynolds*, 504 S.W.3d 283. *State v. Micah Alexander Cates*, No. E2014-01322-SC-R11-CD (Tenn. Nov. 16, 2016) (order). The *Reynolds* decision is relevant to the application of the good-faith exception to the exclusionary rule in the context of warrantless blood draws. We note that the scope of our review in this case is limited by our supreme court's remand order, and this court's previous conclusion relative to exigent circumstances is binding upon this panel of the court.

### a. The State of the Law in Tennessee at the Time of the Warrantless Blood Draw

Our federal and Tennessee constitutions prohibit unreasonable searches and seizures and provide generally that warrantless searches and seizures are presumed unreasonable and that evidence recovered as a result of warrantless searches and seizures is subject to suppression. *See* U.S. Const. amend IV; Tenn. Const. art. I, § 7; *see also Yeargan*, 958 S.W.2d at 629. As a general principle, the police cannot conduct a search without obtaining a warrant. *R.D.S. v. State*, 245 S.W.3d 356, 365 (Tenn. 2008) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). However, our courts have identified narrow exceptions to the warrant requirement. *State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn. 1996) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)). Exigent circumstances dispense with the warrant requirement when "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)). Exigent circumstances arise "only where the State has shown that the search is imperative." *State v. Meeks*, 262 S.W.3d 710, 723 (Tenn. 2008). Our supreme court has stated that "the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." *Id*. Mere

-10-

speculation, however, is insufficient to establish exigency. *Id.* at 723-24. The State "must rely upon specific and articulable facts and the reasonable inferences drawn from them." *Id.* at 724. "The circumstances are viewed from an objective perspective," and the law enforcement officer's subjective intent is irrelevant. *Id*.

In *Schmerber v. California*, the United States Supreme Court noted that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." 384 U.S. 757, 770 (1966). This court interpreted *Schmerber* to conclude that the natural dissipation of alcohol in the bloodstream created a *per se* exigency for purposes of the warrant requirement. *State v. Humphreys*, 70 S.W.3d 752, 760-61 (Tenn. Crim. App. 2001) ("Based upon the fact that evidence of blood alcohol content begins to diminish shortly after drinking stops, a compulsory breath or blood test, taken with or without the consent of the donor, falls within the exigent circumstances exception to the warrant requirement.").

In 2013, the Supreme Court rejected a *per se* exigency rule for nonconsensual blood tests in suspected DUI cases due to the natural dissipation of alcohol in the bloodstream and clarified that exigency "must be determined case by case based on the totality of circumstances." *Missouri v. McNeely*, 133 S. Ct. 1552, 1556, 1561 (2013); *see Reynolds*, 504 S.W.3d at 305-06. We note that this court has acknowledged the change in the law in two cases that were pending on appeal at the same time as the present case. *See State v. Charles A. Kennedy*, No. M2013-02207-CCA-R9-CD, 2014 WL 4953587, at *6-7 (Tenn. Crim. App. Oct. 3, 2014) (stating that although some Tennessee courts previously recognized a per se exigency in DUI cases, *McNeely* mandated a totality of the circumstances analysis to determine whether exigent circumstances existed to justify a warrantless blood draw, and that the implied consent statute did not negate the warrant requirement); *see also State v. James Dean Wells*, No. M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *5-7 (Tenn. Crim. App. Oct. 6, 2014). However, at the time Captain Workman ordered the warrantless blood draw in 2012, it was permissible under Tennessee law for an officer to order a compulsory warrantless blood draw if the officer suspected a person was driving under the influence of alcohol. *See Humphreys*, 70 S.W.3d at 760-61.

### b. Good-faith Exception to the Exclusionary Rule

Generally, evidence obtained by a search or seizure in violation of the Fourth Amendment is subject to suppression at the trial. However, the United States Supreme Court has long recognized an exception to the exclusionary rule when an officer has acted in good-faith reliance on information that was mistaken, through no fault of the officer. *See, e.g., United States v. Leon*, 468 U.S. 897 (1984) (good-faith exception when officers acted in reasonable reliance on a search warrant subsequently determined to be invalid);

*Herring v. United States*, 555 U.S. 135 (2009) (good-faith exception when officers reasonably relied on information in a police-maintained database); *Arizona v. Evans*, 514 U.S. 1 (1995) (good-faith exception when officer reasonably relied on information in a judicially-maintained database); *Illinois v. Krull*, 480 U.S. 340 (1987) (good-faith exception when officers reasonably relied on a statute later declared unconstitutional).

One exception is when "binding appellate precedent specifically *authorizes* a particular police practice," an officer acts "in strict compliance with" the authorized procedure, and the procedure is later declared unconstitutional. *Davis v. United States*, 564 U.S. 229 (2011). Our supreme court adopted the *Davis* exclusionary rule in *State v. Reynolds*. *See* 504 S.W.3d at 312.

The defendant in *Reynolds* was involved in a single-car accident, which resulted in the deaths of two passengers. *Id.* at 289. The defendant was taken to the hospital, where a police deputy interviewed her while she was on a gurney. *Id.* The defendant's medical records indicated that by the time she was questioned, she had received large doses of pain medication and tranquilizers due to becoming combative. The deputy knew the accident had resulted in two fatalities and smelled alcohol coming from the defendant. The defendant indicated, using brief answers or nonverbal agreement to the deputy's questions, that she had been drinking alcohol and driving. When asked whether she would submit to a blood draw, she replied, "Do whatever you have to do." The deputy later testified that this was the only full sentence the Defendant spoke. The deputy ordered a blood draw believing that he had received valid consent. After two suppression hearings, the trial court concluded that the defendant's consent was not voluntary, that the deputy lacked probable cause to order a blood draw pursuant to the implied consent law, and that the results of the blood draw were inadmissible. *Id.* at 289, 291, 294-95.

The State received permission to file an interlocutory appeal, and this court concluded that the deputy had probable cause to believe the defendant had been driving under the influence of alcohol, "which triggered the implied consent law and provided a basis for the warrantless blood draw." *Id.* at 297; *see State v. Corrin Kathleen Reynolds*, No. E2013-02309-CCA-R9-CD, 2014 WL 5840567 (Tenn. Crim. App. Nov. 12, 2014). This court suggested that if the implied consent law were held unconstitutional, a good-faith exception to the exclusionary rule should be adopted and applied to this case. *Id.* at 298 (citing *Corrin Kathleen Reynolds*, 2014 WL 5840567, at \*16).

The Tennessee Supreme Court granted permission to appeal and held that (1) probable cause existed to trigger the provisions of the implied consent law, (2) the deputy did not rely primarily upon the implied consent law to obtain a blood sample, and that (3) the deputy's conduct complied with the exigent circumstances exception to the warrant requirement as it existed at the time. *Reynolds*, 504 S.W.3d at 302-303, 308, 314. The

-12-

court explained that at the time of the blood draw, established Tennessee precedent stated that the natural dissipation of alcohol in the bloodstream created a *per se* exigency in suspected drunk driving cases. *See Humphreys*, 70 S.W.3d at 760-61. As a result, Tennessee law allowed warrantless blood draws, the deputy acted in good-faith reliance on established appellate precedent, and the evidence was not subject to suppression. *Reynolds*, 504 S.W.3d at 314.[1]

### c. Application of *Reynolds*

Applying *Reynolds* to the present case, at the time of the accident, the implied consent statute provided the following:

> Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood . . . . However, no such test or tests may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having reasonable grounds to believe the person was driving while under the influence of alcohol[.]
>
> . . .
>
> (f)(1) If a law enforcement officer has probable cause to believe that the driver of a motor vehicle involved in an accident resulting in the injury or death of another has committed a violation of § 39-13-213(a)(2)[, vehicular homicide,] . . . the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood. The test shall be performed in accordance with the procedure set forth in this section and shall be performed regardless of whether the driver does or does not consent to the test[.]

T.C.A. 55-10-406 (Supp. 2012) (amended 2013, 2016). "Reasonable grounds" has been interpreted by our courts as the equivalent to "probable cause." *See State v. Bowery*, 189 S.W.3d 240, 248 (Tenn. Crim. App. 2004).

---

[3]We note that in both *Davis* and *Reynolds*, neither officer testified that the officer consciously considered appellate precedent or rules articulated in the officer's training when deciding whether to conduct a search. The standard, as articulated by the United States and Tennessee Supreme Courts, is whether the officer's conduct was in "strict compliance" with practices authorized by binding appellate precedent, not whether the officer actually relied on appellate precedent.

Captain Workman testified that the single-car crash involved a "high impact collision to a fixed structure," that the Defendant lay in the road with an open leg fracture, and that Captain Workman smelled an odor of alcohol around the car and the Defendant, although he could not ascertain its source. The crash occurred near a slight curve in the road and the car's engine lay forty feet from the crash site, indicating the car was traveling at a high rate of speed. The Defendant was "confused" and could not tell Captain Workman the name of the victim or how many people had been in the car, although the Defendant had also sustained severe injuries and was in pain. Given the totality of the circumstances, Captain Workman had probable cause to believe that the Defendant had been driving under the influence of alcohol. Although Captain Workman's primary concern was obtaining an untainted blood sample before the Defendant underwent surgery and received large amounts of medication, Captain Workman also testified that he was concerned about the natural dissipation of alcohol in the bloodstream. Like the defendant in *Reynolds*, the officers did not review the implied consent law with the Defendant. However, at the time, *Humphreys* authorized a warrantless blood draw under these circumstances due to a *per se* exigency, and Deputy Workman "strictly compli[ed]" with this practice. As a result, the good-faith exception to the exclusionary rule applied, and the results of the blood test were admissible. We, therefore, affirm the judgment of the trial court in denying the motion to suppress in light of *Reynolds*.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-14-